Dennis J. BOWEN, Sr., Individually and as President of the Seneca Nation of Indians, Plaintiff,

v.

Vincent E. DOYLE, Jr., Penny M. Wolfgang, Justices, New York State Supreme Court, Defendants,

Ross L. John, Sr., Charles L. Ballagh, Linda Doxtator, Robert Kenjockety, Jr., Richard Jimerson, Arthur W. John, Rickey Armstrong, Sr., Karen Bucktooth, Pauline Redeye, Marsha Thompson Barnes, Geraldine Memmo and Maxine Jimerson, Defendants–Intervenors.

No. 95–CV–0043A.

United States District Court, W.D. New York.

Feb. 27, 1995.

Michael A. Brady, Hagerty & Brady, Buffalo, NY, Douglas B.L. Endreson, Sonosky, Chambers & Sachse, Washington, DC, for plaintiff.

Peter Sullivan, Asst. New York State Atty. Gen. (Dennis C. Vacco, Atty. Gen., of counsel), Buffalo, NY, for State defendants.

Joseph F. Crangle, Anthony J. Colucci, Jr., Block & Colucci, Buffalo, NY, Hans Walker, Jr., Hobbs, Straus, Dean & Wilder, Washington, DC, for defendants-intervenors.

## DECISION AND ORDER

ARCARA, District Judge.

### INTRODUCTION

This is an action for declaratory and injunctive relief, pursuant to 42 U.S.C. § 1983, brought by Dennis J. Bowen, Sr. ("Bowen"), in both his individual capacity and in his capacity as the President of the Seneca Nation of Indians (the "Nation"), to enjoin Justices Vincent E. Doyle, Jr. and Penny M. Wolfgang of the New York State Supreme Court (the "State Defendants") from asserting and exercising jurisdiction over an action currently before them captioned *Ross L. John, Sr., et al. v. Dennis J. Bowen*, Index No. 1994/12582 (the "State Court action"). In the State Court action, several present and/or former officials of the Nation's government seek declaratory and injunctive relief against Bowen, alleging, *inter alia*, that he attempted to remove and replace certain members of the tribal council and to terminate certain appointed tribal officials from their positions, all in violation of the Constitution, laws, customs and traditions of the Nation.[1] The plaintiffs in the State Court action have moved to intervene as defendants-intervenors in this case.[2]

Currently before the Court is Bowen's motion for a preliminary injunction pursuant to Fed.R.Civ.P. 65(a). A hearing on the preliminary injunction was held on February 16, 1995.[3] After considering the evidence submitted at the hearing, reviewing the submissions of the parties and hearing argument from counsel, the Court grants Bowen's motion for a preliminary injunction.[4] The following shall constitute the Court's findings of fact and conclusions of law in accordance with Fed.R.Civ.P. 52(a) and 65(d).

### FINDINGS OF FACT

#### I. *Structure of the Nation's Government*

The Seneca Nation is a federally-recognized Indian tribe operating under a constitution originally adopted in 1848 (the "Constitution"). The Constitution replaced the traditional chief form of government with an elected representative democracy.

Under the Constitution, the Nation's government is divided into legislative, executive and judicial departments. The legislative power is vested in a tribal council of sixteen members (the "Council"). Council members are called Councillors of the Seneca Nation of Indians. Ten Councillors constitute a quorum for the transaction of business. The Councillors are elected for terms of four years. If a Councillor dies, resigns or is impeached, the President has the power to fill the vacancy by appointment. The Council has the power to make laws not inconsistent with the Constitution.

---

1. It is noted that there is no allegation in the State Court action that Bowen violated either state or federal law. The claims in the State Court action are based solely on tribal law.

2. Bowen has not opposed the motion to intervene.

3. While the hearing consisted primarily of oral argument, the parties also submitted numerous exhibits, affidavits and the record from the State Court action as evidence in this case.

4. The Court takes no position as to the underlying merits of the controversy between Bowen and the defendant-intervenors and nothing in this Decision and Order should be construed or interpreted to the contrary.

The executive power is vested in the President. The President is elected for a term of two years. The President presides over Council deliberations and has a vote therein. He also has the duty to ensure that laws applicable to the Nation are faithfully executed.

The judicial power of the Nation is vested in two Peacemakers Courts, two Surrogates Courts and a Court of Appeals.[5] The Constitution provides that:

The judicial power shall extend to all cases arising under [the] Constitution, the customs or laws of the Nation, and to any case in which the Nation, a member of the Nation or any person or corporate entity residing on, organized on, or doing business on any of the Reservations shall be a party.

Each Peacemakers Court is comprised of three judges, any two of whom may hold Court and discharge all the duties of the Peacemakers Court. Each Surrogate's Court is comprised of one judge. Both Peacemakers and Surrogate Judges are elected for terms of four years.

All determinations and decisions of the Peacemakers and Surrogates Courts are subject to appeal to the Court of Appeals. The Court of Appeals is comprised of six judges, any three of whom may hear an appeal. Court of Appeals Judges are elected for terms of four years.

All determinations of the Court of Appeals are subject to appeal to the Council upon the granting of a writ of permission by a vote of not less than seven Councillors. Such an appeal, if permitted, must be heard by at least a quorum of the Council. If the decision of the Court of Appeals is not appealed to the Council, it becomes final and no other court or subsequently elected Council may reopen, rehear, reverse or affirm the decision of the Court of Appeals.

## II. The Peacemakers Court Action

On November 1, 1994, Dennis J. Bowen, Sr. was elected President of the Nation. He took office on November 8, 1994.

On November 11, 1994, President Bowen filed an action in the Peacemakers Court (the "Peacemakers Court action") seeking to enjoin Ross John, Sr. from acting or sitting as a member of the Nation's Council.[6] Ross John, Sr. was appointed to his position on the Council by the immediate past President, Barry E. Snyder, Sr.[7] Bowen claims that Ross John, Sr.'s appointment violated the Constitution and is, therefore, null and void.[8] On the same day, November 11, 1994, the Peacemakers Court issued an order enjoining Ross John, Sr. from acting or sitting as a member of the Council until further order of the Court.

On November 13, 1994, Ross John, Sr. moved the Peacemakers Court to vacate the November 11, 1994 Order. On November 14, 1994, a hearing on the motion to vacate was held. By Order dated November 18, 1994, the Peacemakers Court denied the motion to vacate and ordered that the November 11 Order remained in effect. A further hearing was scheduled for December 12, 1994.

On November 29, 1994, Tyrone LeRoy and Rosemary Patterson, two enrolled members of the Nation, requested and received permission to intervene as plaintiffs in the Peacemakers Court action. They filed an

5. The Constitution was amended on November 9, 1993 to add the Court of Appeals. Prior to that time, all decisions of the Peacemakers and Surrogates Courts were subject to direct appeal to the Council.

6. This action is captioned *Dennis J. Bowen, Sr., et al. v. Ross L. John, Sr., et al.,* Civil Action No. 1111–94 (Seneca Nation of Indians Peacemakers Court).

7. Ross John, Sr. was already serving as an elected member of the Council at the time he was appointed to replace another Councillor.

8. The complaint alleges that Ross John, Sr.'s appointment "violates the Constitution which provides ... that the Councillors shall be elected for four-year terms since effectively [Ross John, Sr.'s] appointment by [Snyder] constitutes an attempt to transform [Ross John, Sr.'s] four-year term of office into a six-year term of office and usurps the power of the members and electorate of the Nation to elect their representatives."

amended complaint which, in addition to the claims originally asserted by Bowen against Ross John, Sr., asserts claims against four new defendants: Arthur W. John, Maxine Jimerson, Geraldine Memmo and Susan Pierce. The amended complaint alleges that, on November 3, 1994, Arthur John was unlawfully appointed to the position of Councillor by the immediate past President, Barry Snyder, to fill the vacancy left after Councillor Adrian Stevens, who was elected Treasurer of the Nation on November 1, 1994, resigned from the Council.[9] The amended complaint also alleges that Maxine Jimerson, Chief Executive Officer of the Seneca Nation Gaming Enterprises; Geraldine Memmo, Director of Human Resources; and Susan Pierce, Director of the Area Office of the Aging, were each terminated from their respective positions, but continue to hold themselves out as Nation officials. The amended complaint seeks to enjoin Ross John, Sr. and Arthur John from serving as Councillors and to restrain Maxine Jimerson, Geraldine Memmo and Susan Pierce from continuing to act in their respective positions.

On the same day, November 29, 1994, the Peacemakers Court issued an Order enjoining Arthur John from acting as a Councillor and the other three new defendants from acting in their respective governmental positions. The defendants subsequently moved to dismiss the Peacemakers Court action, but their motion was denied in an Order dated January 6, 1995. The January 6 Order also provided that the November 29 Order was still in effect and that President Bowen was to enforce the Order.

On December 9, 1994, defendants appealed the Peacemakers Court's November 18 and November 29 Orders to the Nation's Court of Appeals. The action was not stayed pending the appeal and proceedings have continued in the Peacemakers Court. On December 15,

1994, default judgment was entered against Ross John, Sr. for failure to answer the complaint. The claims against the other defendants are awaiting trial. The appeal is also pending.

### III. *The State Court Action*

On November 18, 1994, the same day the Peacemakers Court denied Ross John, Sr.'s motion to vacate its November 11, 1994 Order, Ross John, Sr., along with twelve other enrolled members of the Nation, brought an action for declaratory and injunctive relief in New York State Supreme Court against Bowen, *Ross L. John, Sr., et al. v. Dennis J. Bowen*, Index No. 1994/12582.[10] The suit is purportedly brought against Bowen in his individual capacity. The State Court complaint does not mention the existence of the Peacemakers Court action. The State Court action was assigned to Justice Doyle.

The State Court complaint alleges that Bowen, acting outside the scope of his authority, violated the Nation's Constitution and laws by: (1) attempting to remove and replace Ross John, Sr. as a Councillor; (2) attempting to remove and replace Arthur John as a Councillor; (3) seizing and occupying one of the Nation's administrative buildings thereby preventing Nation officials from conducting business; (4) attempting to terminate the Nation's Human Resource Director Geraldine Memmo; (5) attempting to terminate Gaming Enterprises CEO Maxine Jimerson; (6) conducting an improper Council meeting on November 12, 1994 [11]; (7) attempting to rescind the Nation's Governmental Law without approval of the Council [12]; and (8) attempting to terminate all department heads in the Nation's government. The plaintiffs ask the State Court to declare these actions unlawful, null and void. They also ask the State Court to enjoin Bowen

---

**9.** The amended complaint alleges that, under the Nation's customs and traditions, Snyder did not have the authority to appoint Arthur John as Councillor after Bowen was elected President on November 1, 1994.

**10.** The State Court plaintiffs include: (1) Ross John, Sr.; (2) Arthur John; (3) eight current Council members; (4) Adrian Stevens; (5) Maxine Jimerson; and (6) Geraldine Memmo.

**11.** The complaint alleges that Bowen conducted the November 12, 1994 meeting without a quorum present and, instead, appointed "Councillors of the Day" to serve temporarily in the place of actual Council members.

**12.** This action was allegedly taken by Bowen at the November 12, 1994 meeting.

from: (1) impeding future meetings of the Council; (2) calling meetings without proper notice to all sixteen Councillors; and (3) appointing temporary "Councillors of the Day" in the absence of one or more of the sixteen members of the Council.

On the same day the State Court complaint was filed, November 18, 1994, Justice Doyle issued an *ex parte* Order [13] enjoining Bowen from:

 a) removing or attempting to remove any of the plaintiffs from their seats on the Council of the Seneca Nation of Indians; and

 b) appointing or attempting to appoint any one to replace any of the plaintiffs on the Council of the Seneca Nation of Indians; and

 c) removing or attempting to remove Department Heads, the Human Resource Director and the Seneca Gaming Enterprises CEO from their employment with the Seneca Nation of Indians; [and]

 d) removing or attempting to remove any other employees of the Nation who, pursuant to the Government Law or Human Resource Policies and Procedures Manual, can only be removed by the Council or Department Heads or Commissioners; and.

 e) otherwise acting or continuing to act in a manner that impedes the meetings of the Council of the Seneca Nation of Indians.

Justice Doyle's November 18 Order does not mention the pending Peacemakers Court action or the Peacemakers Court's Orders of November 11 and November 18. Justice Doyle scheduled a preliminary injunction hearing for November 28, 1994.

By memorandum filed with the State Court on November 26, 1994, Bowen opposed the State Court plaintiffs' request for injunctive relief, informed the State Court of the nature and scope of the pending proceedings before the Peacemakers Court, and requested that the State Court action be dismissed. He specifically advised the State Court of the Peacemakers Court's November 11 Order enjoining Ross John, Sr. from acting or sitting as a member of the Council pending further hearing in the Peacemakers Court.

Justice Doyle conducted an evidentiary hearing over the course of several days from November 30, 1994 to December 12, 1994 on the issue of the State Court's jurisdiction. On December 9, 1994, in apparent anticipation of a Council meeting scheduled for December 10, 1994, Justice Doyle issued an Order: (1) directing that the appointment by former President Barry Snyder of Ross John, Sr. to the Council be allowed to stand and that both Ross John, Sr. and David Silverheels (an individual appointed by Bowen to serve on the Council) be seated as Councillors until further order of the Court; (2) staying any action taken by the Council at any meeting on November 12, 1994; and (3) ordering that the State Court's November 18 Order against Bowen remain in effect.

On December 12, 1994, Justice Doyle issued an Order providing that the terms and conditions of his December 9 Order would apply with full force and effect to any and all meetings of the Council until further order of the Court. The December 12 Order also provided that the State Court would continue to exercise jurisdiction over the proceedings until the jurisdiction issue was decided. Neither the December 9 Order nor the December 12 Order makes any reference to the Peacemakers Court action or, more specifically, to the Peacemakers Court's November 11 and November 18 Orders enjoining Ross John, Sr. from sitting on the Council.

In a decision dated December 22, 1994, Justice Doyle held that the State Court has jurisdiction over this matter pursuant to 25 U.S.C. § 233 and N.Y. Indian Law § 5.[14] He

---

**13.** It does not appear from the record that Justice Doyle was aware of the pending Peacemakers Court action when he issued this Order.

**14.** Justice Doyle's December 22 Decision and Order appears to be based, in part, on what he saw as a concession by Bowen that the State Court has concurrent jurisdiction with the Peace-

makers Court over this matter. While parties cannot—in any event—create subject matter jurisdiction by consent or default, the statement from Bowen's brief relied upon by Justice Doyle seems plainly to have been taken out of context. Indeed, throughout Bowen's brief before the State Court, he argues that the State Court does

found that the State Court action is not barred by the pre-existing Peacemakers Court action because the issues pending before the State Court are not pending before the Peacemakers Court. He further found that the evidence adduced at the hearing "makes it uncertain or unpredictable as to what might be accomplished in the Peacemaker Court." Justice Doyle also held that the State Court action is not barred by the doctrine of sovereign immunity because the State Court plaintiffs are alleging that President Bowen was acting outside the scope of his tribal authority. For these reasons, Justice Doyle denied Bowen's motion to dismiss the State Court action and ordered that all previous Orders of the State Court were to remain in effect until resolution of the State Court action. He further stated that the issues in the State Court action would be resolved in accordance with the Constitution and substantive law of the Nation and, where appropriate, in accordance with the customs and traditions of the Nation. Bowen has appealed Justice Doyle's December 22 Decision. He also moved before the Appellate Division, Fourth Department, for a stay of the State Court action pending appeal, but that request was denied by M. Dolores Denman, Presiding Justice, on January 9, 1995.

On December 30, 1994, upon the motion of Ross John, Sr., Justice Doyle issued an Order to Show Cause requiring Bowen to show cause why he should not be held in contempt for willful violations of the State Court's previous Orders. In the same December 30 Order, Justice Doyle also ordered the Erie County Sheriffs "and/or their special Seneca Tribal Police deputies": (1) to accompany Ross John, Sr. and Arthur John to all Council meetings; (2) to enforce the State Court's Orders allowing Ross John, Sr. and Arthur John to sit on the Council; (3) to physically restrain Bowen and those acting in concert with him from interfering with the State Court's decision to permit Ross John, Sr. and Arthur John to sit on the Council; and (4) to physically restrain Bowen and those acting in concert with him from interfering with the State Court's Order permitting Maxine Jimerson, Geraldine Memmo and Susan Pierce to perform their employment duties and to receive their salaries. The State Court's December 30 Order did not mention the November 11, November 18 and November 29 Orders of the Peacemakers Court which: (1) enjoined Ross John, Sr. and Arthur John from sitting on the Council; (2) enjoined Maxine Jimerson, Geraldine Memmo and Susan Pierce from performing their employment duties; and (3) ordered President Bowen to enforce the Peacemakers Court's Orders.

A hearing on the December 30 Order to Show Cause was scheduled for January 23, 1995. Justice Wolfgang was assigned by Justice Doyle to preside over the contempt proceeding. On January 12, 1995, Justice Doyle issued an Order providing that the previous orders of the State Court were in effect and restraining Niagara Mohawk Power Corp., National Fuel Gas Distribution, NYNEX and New York State Electric & Gas Corp. from discontinuing or shutting off, temporarily or permanently, any utility service to any government or enterprise building of the Nation until further order of the State Court.

## IV. The Federal Court Action

This action was filed by President Bowen on Friday morning, January 20, 1995. At the same time the complaint was filed, Bowen moved for a temporary restraining order ("TRO") and/or preliminary injunction enjoining the State Defendants from continuing to assert and exercise jurisdiction over the State Court action and restraining the State Defendants from proceeding with the contempt hearing scheduled for January 23, 1995. Bowen also moved for an expedited hearing on the TRO motion. The Court

not have jurisdiction. For example, in the two paragraphs preceding the statement relied upon by Justice Doyle, Bowen argues that his conduct was "not properly before a court of civil jurisdiction," because it involved internal matters not subject to judicial inquiry under the doctrine of sovereign immunity. The statement relied upon by Justice Doyle was, in contrast, a general statement which introduced an alternative argument which also contested the jurisdiction of the State Court. It does not appear, however, that the alleged concession was the sole or even the primary basis for Justice Doyle's Decision. Thus, this Court need not consider it any further.

granted the motion for an expedited hearing and a hearing was held later in the afternoon of January 20.

At the hearing, the plaintiffs in the State Court action appeared and made an oral motion to intervene. The Court granted the motion for purposes of the TRO hearing. After an in-chambers conference, the State Defendants graciously agreed to adjourn the contempt hearing until January 24, 1995 in order to give the Court an adequate opportunity to review the parties' submissions and hear oral argument on the TRO motion.

Oral argument on the TRO motion was held on Monday, January 23, 1995. During the argument, the Court was contacted by Justice Wolfgang's chambers and informed that the State Court contempt hearing was postponed until January 31, 1995. After hearing argument, the Court reserved decision. On January 27, 1995, the Court issued a TRO enjoining the State Defendants from asserting and exercising jurisdiction over the State Court action until such time as the Court ruled on Bowen's motion for a preliminary injunction.[15] The TRO expires on February 27, 1995.

## V. Impeachment Proceedings

Defendants-intervenors claim that both this action and the State Court action are now moot because, on January 28, 1995, Bowen was impeached as President of the Nation. Bowen asserts that he was not impeached. On February 6, 1995, the Peacemakers Court held that the impeachment proceedings against Bowen were invalid under the Constitution.[16] *See Scanlan, et al. v. Printup, et al.,* Civil Action No. 0127–95 (Seneca Nation of Indians Peacemakers Court).

## CONCLUSIONS OF LAW

### I. Summary of the Parties' Positions [17]

Bowen urges this Court to enjoin the State Court action because the claims asserted in that action involve the internal affairs of the Nation and the State Court lacks jurisdiction over such claims. More specifically, Bowen argues that, under the Treaty of November 11, 1794 (the "Treaty of 1794"), 7 Stat. 44, the Nation retains the right of self-government and exclusive jurisdiction over its internal affairs and the State Defendants therefore lack jurisdiction to adjudicate such a dispute. Bowen further argues that the State Court action is barred by the doctrine of exhaustion of tribal remedies. Bowen asserts that the State Court plaintiffs should be required to litigate their claims in the Peacemakers Court action that was filed prior to the State Court action. Finally, Bowen argues that the State Court action is barred by the doctrine of sovereign immunity, notwithstanding that the action was brought against Bowen as an individual rather than as President of the Nation, because the relief requested by the plaintiffs in the State Court action and the orders issued by Justice Doyle operate directly against the Nation by purporting to decide who may serve on the Nation's Council; to direct how the Council's meetings are to be conducted; to determine the validity of Council action; to require the Nation to expend funds and direct how those funds are to be spent; and to order Nation police officers to enforce State Court orders against officials of the Nation's government.

Bowen contends that he will suffer immediate and irreparable injury unless the State Defendants are enjoined because he will be subject to fines, arrest and incarceration for alleged violations of the State Court's Orders—notwithstanding the fact that the State Court lacks jurisdiction and that he has acted

15. On February 2, 1995, Tyrone LeRoy and Rosemary Patterson, who, as stated earlier, are plaintiffs-intervenors in the Peacemakers Court action, moved to intervene as plaintiffs in this case. At the preliminary injunction hearing, counsel for the defendants-intervenors stated that the defendants-intervenors would oppose the intervention of Mr. LeRoy and Ms, Patterson. The Court has not yet set a briefing schedule for the motion to intervene.

16. Defendants-intervenors counter that the impeachment proceedings were not subject to judicial review.

17. This summary is not intended by the Court to be exhaustive, but instead is intended only to aid in understanding the parties' respective positions and the Court's analysis in this Decision.

in accordance with the Orders of the Peacemakers Court. He further argues that, unless the State Court action is enjoined, the sovereign authority of the Nation to determine matters of self-government within its own forums will be irreparably damaged by subordination of the Nation's sovereignty to the State Courts.

The State Defendants take the position that the State Court properly exercised jurisdiction over this dispute and that, in any event, this Court should not interfere with the State Court proceedings. More specifically, the State Defendants argue that the Anti–Injunction Act, 28 U.S.C. § 2283; the *Younger* abstention doctrine; and the United States Supreme Court's decision in *United States ex rel. Kennedy v. Tyler*, 269 U.S. 13, 46 S.Ct. 1, 70 L.Ed. 138 (1925), all bar this Court from enjoining the State Court action. In other words, it is the State Defendants' position that Bowen should be required to litigate the issue of the State Court's jurisdiction in the state court system, with ultimate review by the United States Supreme Court.

The defendants-intervenors similarly argue that this Court is barred from enjoining the State Court action [18] and that Bowen must litigate the jurisdiction issue in the State Courts. They also argue that the State Court has jurisdiction over this dispute pursuant to 25 U.S.C. § 233. They contend that, under § 233, Congress granted New York courts concurrent jurisdiction with the Peacemakers Courts over all civil actions involving members of the Nation, including cases where, as here, there is a dispute between officials of the Nation's government regarding the scope of their respective authorities and powers under the Constitution and laws of the Nation. They further argue that sovereign immunity does not bar the State Court action because: (1) they sued Bowen in his individual capacity for acts he allegedly committed outside the scope of his authority under the Nation's Constitution and laws; and (2) the State Court is applying tribal, not state, law. Moreover, defendants-

intervenors argue that the exhaustion of tribal remedies doctrine does not apply in this instance because: (1) the doctrine does not apply to states such as New York where Congress has expressly granted concurrent jurisdiction to the state courts; (2) the Nation's Peacemakers Court is corrupt and biased; and (3) the claims and parties in the Peacemakers Court action are not identical to those in the State Court action. Finally, as stated earlier, defendants-intervenors argue that this action and the State Court action are now moot because Bowen has been impeached as President of the Nation.

### II. *Preliminary Injunction Standard*

■ The standard for issuing a preliminary injunction is well-settled in the Second Circuit. The party seeking the injunction must demonstrate (1) irreparable harm should the injunction not be granted, and (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits and a balance of hardships tipping decidedly toward the party seeking injunctive relief. *Able v. United States*, 44 F.3d 128, 131 (2d Cir.1995); *Resolution Trust Corp. v. Elman*, 949 F.2d 624, 626 (2d Cir.1991); *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979). While this standard does not explicitly mention the public interest, as do some other Circuits' standards, the Second Circuit has recognized that a federal court, when acting as a court of equity, "may go much further both to give or to withhold relief in furtherance of the public interest than where only private interests are involved." *Standard & Poor's Corp. v. Commodity Exch., Inc.*, 683 F.2d 704, 711 (2d Cir.1982) (quoting *Brown & Williamson Tobacco Corp. v. Engman*, 527 F.2d 1115, 1121 (2d Cir.1975), *cert. denied*, 426 U.S. 911, 96 S.Ct. 2237, 48 L.Ed.2d 837 (1976)); *Carey v. Klutznick*, 637 F.2d 834, 839 (2d Cir.1980) ("[T]he public interest has always been a factor to be considered in the granting of a preliminary injunction."). "When significant public interests are involved, courts have a special obligation to assess carefully the propriety of preliminary

---

**18.** In addition to the grounds cited by the State Defendants (*i.e.*, the Anti–Injunction Act, *Younger* and *Tyler*), the defendants-intervenors also cite the *Rooker–Feldman* doctrine as a bar to federal court intervention.

injunctive relief." *Stieberger v. Bowen*, 801 F.2d 29, 34 (2d Cir.1986). Applying this standard to the instant case, the Court finds that Bowen is entitled to injunctive relief.

### III. *Likelihood of Success on the Merits* [19]

 The Court finds that plaintiff is likely to succeed on the merits of this action. First, under the Treaty of 1794 and well-settled case law, the Nation retains the right to self-government and exclusive jurisdiction over its internal affairs and the State Defendants therefore lack jurisdiction to adjudicate such a dispute. Second, the pendency of the Peacemakers Court action, which concerns the same dispute and was filed prior to the State Court action, renders the State Court without jurisdiction to proceed. Third, the State Court action is barred by the doctrine of sovereign immunity. Fourth, none of the abstention or procedural bars cited by the State Defendants and the defendants-intervenors apply to prevent this Court from granting an injunction in this case. Finally, neither the State Court action nor this action is moot.

### A. *Under the Treaty of 1794 and Well–Settled Case Law, the Nation Retains the Rights to Self–Government and Exclusive Jurisdiction Over its Internal Affairs.*

Under the Treaty of 1794 and well-settled case law, the Nation holds the right to self-government. The Supreme Court so held over 125 years ago in *Fellows v. Denniston*, 72 U.S. (5 Wall.) 761, 18 L.Ed. 708 (1867) and the Second Circuit so recognized in *United States v. Boylan*, 265 F. 165 (2d Cir.1920).[20] In *Fellows*, the Court held that, under the Treaty of 1794, the United States "acknowledged the [Seneca] reservations to be the property of the Seneca nation—that they will never claim them nor disturb this nation in their free use and enjoyment, and that they

shall remain theirs until they choose to sell them. These are the guarantees given by the United States, and which her faith is pledged to uphold." *Id.* 72 U.S. at 768. As the Court held, unless and until the Seneca are lawfully removed from their lands, "they are to be regarded as still in their ancient possessions, and are in under their original rights, and entitled to the undisturbed enjoyment of [their lands]." *Id.* 72 U.S. at 770.

 Indeed, it is well-settled that the right of self-government is a right held by Indian tribes in their capacity as sovereign entities. As the Supreme Court held in the historic Cherokee cases, an Indian tribe is a "distinct political society ... capable of managing its own affairs and governing itself," *Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 16, 8 L.Ed. 25 (1831), and retains the "right of self-government." *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 556, 8 L.Ed. 483 (1832). By entering into treaties, Indian Tribes did not "surrender [their] independence—[their] right to self-government." *Id.* 31 U.S. at 561. To the contrary, "[i]mplicit in these treaty terms ... was the understanding that the internal affairs of the Indians remained exclusively within the jurisdiction of whatever tribal government existed." *Williams v. Lee*, 358 U.S. 217, 221–22, 79 S.Ct. 269, 271, 3 L.Ed.2d 251 (1959).

 This fundamental principle—that Indian tribes retain the right to self-government—has been repeatedly reaffirmed by the Supreme Court. It is now well-settled that "[t]he sovereignty retained by tribes includes 'the power of regulating their internal and social relations.'" *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 332, 103 S.Ct. 2378, 2385, 76 L.Ed.2d 611 (1983) (quoting *United States v. Kagama*, 118 U.S. 375, 381–82, 6 S.Ct. 1109, 1112–13, 30 L.Ed. 228 (1886)), and that this authority includes

---

**19.** While the Court would normally address the irreparable harm prong of the preliminary injunction standard first, in this instance, an analysis of the merits of plaintiff's position will serve as a convenient lead into the irreparable harm analysis.

**20.** In *Boylan*, the court held, speaking with reference to the Oneida, (who are also parties to the

Treaty of 1794), "[t]he right of self-government has never been taken from them. It has never been questioned, and no attempt made at subjecting them as a people." *Id.* at 173. "At all times the rights which belong to self-government have been recognized as vested in these Indians." *Id.*

the "power to make their own substantive law in internal matters and to enforce that law in their own forums." *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 55, 98 S.Ct. 1670, 1675, 56 L.Ed.2d 106 (1978) (citations omitted); *see also Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9, 18, 107 S.Ct. 971, 977, 94 L.Ed.2d 10 (1987); *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 148 n. 14, 102 S.Ct. 894, 907 n. 14, 71 L.Ed.2d 21 (1982); *United States v. Wheeler*, 435 U.S. 313, 322, 98 S.Ct. 1079, 1085, 55 L.Ed.2d 303 (1978); *Ex parte Crow Dog*, 109 U.S. 556, 572, 3 S.Ct. 396, 406, 27 L.Ed. 1030 (1883).

■ It is equally well-settled that tribal authority over internal matters is exclusive. In *Talton v. Mayes*, 163 U.S. 376, 16 S.Ct. 986, 41 L.Ed. 196 (1896), a Cherokee Indian challenged his conviction for murder in a Cherokee court on the ground that he had been indicted by a grand jury consisting of only five jurors in violation of the Fifth Amendment to the United States Constitution and the Constitution and laws of the Cherokee Nation. The Court held that the powers of self-government exercised by the Cherokee Nation existed prior to the United States Constitution, and thus were not limited by its terms. *Id.* at 384, 16 S.Ct. at 989. As for the alleged violations of the Cherokee Constitution, the Court refused to address these questions, holding that they were "solely matters within the jurisdiction of the courts of that nation." *Id.* at 385, 16 S.Ct. at 989. More recently, the Court reaffirmed the same rule in *LaPlante*, 480 U.S. at 19, 107 S.Ct. at 978, holding that unless the tribal court lacks jurisdiction, "proper deference to the tribal court system precludes relitigation of issues raised ... and resolved in the Tribal Courts."[21]

■ The basis of these established legal principles—the right to tribal self-government and the exclusivity of jurisdiction over internal tribal affairs—and of their consistent reaffirmation by the Supreme Court,

is the rule that Indian tribes, as sovereign entities, retain all rights not specifically withdrawn by treaty or federal law. In *Worcester*, the Supreme Court read the Treaty of Hopewell, November 28, 1785, 7 Stat. 18, to be a grant of rights by—not to—the Cherokee, and held that the Tribe retained those aspects of their sovereignty not specifically ceded or surrendered. *Id.* 31 U.S. at 553–54. As the Supreme Court explained in *United States v. Winans*, 198 U.S. 371, 25 S.Ct. 662, 49 L.Ed. 1089 (1905), "the treaty was not a grant of rights to the Indians, but a grant of rights from them—a reservation of those rights not granted." *Id.* at 381, 25 S.Ct. at 664. Accordingly, it is now well-established that, under the reserved rights doctrine, "Indian tribes still possess those aspects of sovereignty not withdrawn by treaty or statute, or by implication as a necessary result of their dependent status." *Wheeler*, 435 U.S. at 323, 98 S.Ct. at 1086. "Because the Tribe retains all inherent attributes of sovereignty that have not been divested by the Federal government, the proper inference from silence ... is that the sovereign power ... remains intact." *Merrion*, 455 U.S. at 149, 102 S.Ct. at 907.

■ A necessary corollary to the rights of Indian tribes to self-government and to exclusive jurisdiction over their internal affairs is the principle that state law does not apply on the reservations. In *Worcester*, the Supreme Court held that the law of the State of Georgia had no force within the boundaries of the Cherokee Nation. "The Cherokee nation, then, is a distinct community, occupying its own territory ... in which the laws of Georgia can have no force, and which the citizens of Georgia have no right to enter, but with the assent of the Cherokees themselves, or in conformity with treaties, and with the acts of congress." 31 U.S. at 561; *see also Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 8 L.Ed. 25 (1831). As the Court explained in *Warren Trading Post v. Ari-*

---

**21.** These principles have been consistently applied by lower federal courts in refusing to hear disputes arising from internal tribal affairs. *See, e.g., Nero v. Cherokee Nation of Oklahoma*, 892 F.2d 1457, 1463 (10th Cir.1989); *Wheeler v. Swimmer*, 835 F.2d 259, 262 (10th Cir.1987); *Wheeler v. United States*, 811 F.2d 549, 553 (10th Cir.1987); *Runs After v. United States*, 766 F.2d 347, 352 (8th Cir.1985); *Goodface v. Grassrope*, 708 F.2d 335, 339 (8th Cir.1983); *Tillett v. Hodel*, 730 F.Supp. 381, 384 (W.D.Okla.1990), aff'd, 931 F.2d 636 (10th Cir.1991); *Wisconsin Winnebago Business Comm. v. Koberstein*, 636 F.Supp. 814 (W.D.Wisc.1986).

*zona Tax Comm.,* 380 U.S. 685, 686–87, 85 S.Ct. 1242, 1243, 14 L.Ed.2d 165 (1965), "from the very first days of our Government, the Federal Government had been permitting the Indians largely to govern themselves, free from state interference." *See also Ramah School Bd. v. Bureau of Revenue,* 458 U.S. 832, 846, 102 S.Ct. 3394, 3402, 73 L.Ed.2d 1174 (1982); *McClanahan v. Arizona Tax Comm'n,* 411 U.S. 164, 168, 93 S.Ct. 1257, 1260, 36 L.Ed.2d 129 (1973); *Rice v. Olson,* 324 U.S. 786, 789, 65 S.Ct. 989, 991, 89 L.Ed. 1367 (1945).

Indeed, this Court followed the rule against state interference in internal tribal affairs in *United States v. Charles,* 23 F.Supp. 346 (W.D.N.Y.1938). In *Charles,* an action to set aside a deed, this Court held that the Tonawanda Senecas had the right to self-government and that this right rendered "[i]nterference . . . by injunction of the state courts . . . an unwarranted and unlawful disturbance of the right of the Indians to the free use and enjoyment of its tribal property and a violation of treaties guaranteeing these rights." *Id.* at 348. The Court recognized that:

> The right of a tribe to govern itself in accord with tribal laws and customs without interference or dictation from the state courts has been upheld by the highest court of New York state. *Mulkins v. Snow,* 232 N.Y. 47, 133 N.E. 123; *Patterson v. Seneca Nation,* 245 N.Y. 433, 440, 157 N.E. 734.

*Id.*

The Supreme Court has continued to apply the rule that Indian tribes have the right to control tribal affairs on reservation lands, free from state interference. For example, in *Fisher v. District County Court,* 424 U.S. 382, 96 S.Ct. 943, 47 L.Ed.2d 106 (1976), the Court held that a state court may not exercise jurisdiction over an adoption proceeding in which all parties were tribal members, despite a tribal ordinance purporting to consent to such jurisdiction, explaining that "[t]he right of the Northern Cheyenne Tribe to govern itself independently of state law has been consistently protected by federal statute," *id.* at 386, 96 S.Ct. at 946, and that:

State-court jurisdiction plainly would interfere with the powers of self-government conferred upon the . . . Tribe and exercised through the Tribal Court. It would subject a dispute arising on the reservation among reservation Indians to a forum other than the one they have established for themselves. As the present record illustrates, it would create a substantial risk of conflicting adjudications affecting the custody of the child and would cause a corresponding decline in the authority of the Tribal Court.

*Id.* at 387–88, 96 S.Ct. at 947; *see also California v. Cabazon Band of Mission Indians,* 480 U.S. 202, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987); *Montana v. Blackfeet Tribe of Indians,* 471 U.S. 759, 105 S.Ct. 2399, 85 L.Ed.2d 753 (1985); *County of Oneida v. Oneida Indian Nation,* 470 U.S. 226, 105 S.Ct. 1245, 84 L.Ed.2d 169 (1985). Simply stated, when it comes to Indian affairs, state courts are courts of limited jurisdiction. *See United States v. Pawnee Business Council,* 382 F.Supp. 54, 58 (N.D.Okla.1974) (rule that federal courts are without jurisdiction over internal Indian tribal affairs applies to state courts as well).

These principles have long been applied by the federal and state courts in cases involving the Seneca Nation of Indians. The early history of their application was traced by the Supreme Court in *Oneida Indian Nation v. County of Oneida,* 414 U.S. 661, 671–72, 94 S.Ct. 772, 779, 39 L.Ed.2d 73 (1974):

> In *The New York Indians,* 5 Wall 761 [18 L.Ed. 708] (1867), the State sought to tax the reservation lands of the Senecas. The Court held the tax void. The Court referred to the Indian right of occupancy as creating "an indefeasible title to the reservations that may extend from generation to generation, and will cease only by the dissolution of the tribe, or their consent to sell to the party possessed of the right of pre-emption," *id.,* [5 Wall] at 771, and noted that New York "possessed no power to deal with Indian rights or title." *Id.,* [5 Wall] at 769. Of major importance, however, was the treaty of 1794 in which the United States acknowledged certain territory to be the property of the Seneca

Nation and promised that "it shall remain theirs until they choose to sell the same to the people of the United States." *Id.*, [5 Wall] at 766–767. The rights of the Indians to occupy those lands "do not depend on ... any ... statutes of the State, but upon treaties, which are the supreme law of the land; it is to these treaties we must look to ascertain the nature of these rights, and the extent of them." *Id.*, [5 Wall] at 768.

 As these decisions show, under the Treaty of 1794, the Nation holds the right of self-government and retains exclusive jurisdiction over its internal affairs. This authority includes the power to interpret the Constitution and laws of the Nation in such matters, to determine the composition of the Council, and to resolve employment disputes involving employees of the Nation's government. The State Court action at issue here clearly implicates the internal affairs of the Nation. Indeed, it is difficult to imagine a more intrusive intervention into the internal affairs of the Nation than that which results from the Orders issued by the State Court. These Orders purport to

decide who may serve on the Nation's Council; to direct when the Council, as constituted by the State Court, is to meet and how it is to conduct its business; to void actions taken by the Council and the President at a prior meeting of the Council; and to compel the Seneca Tribal Police to enforce the State Court's Orders against the President of the Nation. In addition, the State Court's Orders ignore, and in some instances even contravene, the Orders of the Peacemakers Court. Accordingly, unless Congress has subsequently abrogated the Nation's treaty rights to self-government and exclusive jurisdiction over its internal affairs, and granted jurisdiction over such matters to the courts of the State of New York, the State Court lacks jurisdiction over this dispute.

B. *25 U.S.C. § 233 Does Not Grant Jurisdiction to the State Court Over the Internal Affairs of the Nation.*

 The defendants-intervenors argue that 25 U.S.C. § 233 [22] is a congressional grant of jurisdiction to the State Court over the subject matter of this dispute.[23] The Court rejects this argument for three rea-

---

22. Section 233 provides:

The courts of the State of New York under the laws of such State shall have jurisdiction in civil actions and proceedings between Indians or between one or more Indians and any other person or persons to the same extent as the courts of the State shall have jurisdiction in other civil actions and proceedings, as now or hereafter defined by the laws of such State: *Provided,* That the governing body of any recognized tribe of Indians in the State of New York shall have the right to declare, by appropriate enactment prior to September 13, 1952, those tribal laws and customs which they desire to preserve, which, on certification to the Secretary of the Interior by the governing body of such tribe shall be published in the Federal Register and thereafter shall govern in all civil cases involving reservation Indians when the subject matter of such tribal laws and customs is involved or at issue, but nothing herein contained shall be construed to prevent such courts from recognizing and giving effect to any tribal law or custom which may be proven to the satisfaction of such courts: *Provided further,* That nothing in this section shall be construed to require any such tribe or the members thereof to obtain fish and game licenses from the State of New York for the exercise of any hunting and fishing rights provided for such Indians under any agreement,

treaty, or custom: *Provided further,* That nothing herein contained shall be construed as subjecting the lands within any Indian reservation in the State of New York to taxation for State of local purposes, nor as subjecting any such lands, or any Federal or State annuity in favor of Indians or Indian tribes to execution on any judgment rendered in the State courts, except in the enforcement of a judgment in a suit by one tribal member against another in the matter of the use or possession of land: *And provided further,* That nothing herein contained shall be construed as authorizing the alienation from any Indian nation, tribe, or band of Indians of any lands within any Indian reservation in the State of New York: *Provided further,* That nothing herein contained shall be construed as conferring jurisdiction on the courts of the State of New York or making applicable the claims with respect thereto which relate to transactions or events transpiring prior to September 13, 1952. (emphasis in original).

23. Defendant-intervenors rely on a number of New York cases in support of their construction of § 233. None of these cases, however, dealt with the jurisdictional issue raised here and none involved an internal conflict of the kind and magnitude as the one presented before this Court.

sons. First, the Nation's rights to self-government and exclusive jurisdiction over its internal affairs are treaty rights and cannot be abrogated absent a "clear and plain" showing that Congress intended to interfere with those rights, and defendants-intervenors have failed to make such a showing. Second, federal courts have consistently rejected constructions of treaties and statutes that would terminate or diminish the authority of Indian tribes over their internal affairs. Third, the Supreme Court's analysis in *Bryan v. Itasca County*, 426 U.S. 373, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976) is controlling and, when applied to § 233, requires rejection of defendants-intervenors' position.

1. *There has Been no Showing that Congress Intended to Abrogate the Nation's Treaty Rights.*

■■■■■ As discussed above, the Nation's rights to self-government and exclusive jurisdiction over its internal affairs are treaty rights. In *United States v. Dion*, 476 U.S. 734, 106 S.Ct. 2216, 90 L.Ed.2d 767 (1986), the Supreme Court held that, in order for a court to hold that an Indian treaty right has been subsequently abrogated by Congress, it is "essential" that there be:

> clear evidence that Congress actually considered the conflict between its intended action on the one hand and Indian treaty rights on the other, and chose to resolve the conflict by abrogating that treaty.

*Id.* at 740, 106 S.Ct. at 2220. The Court held that evidence of congressional intent to interfere with a treaty right must be "clear and plain," *id.* at 738, 106 S.Ct. at 2219, and that "in the absence of explicit statement, 'the intention to abrogate or modify a treaty ·is not to be lightly imputed to the Congress.'" *Id.* at 739, 106 S.Ct. at 2220 (quoting *Menominee Tribe v. United States*, 391 U.S. 404, 413, 88 S.Ct. 1705, 1710, 20 L.Ed.2d 697 (1968)). This language reflects the Supreme Court's continued acceptance of "a principle deeply rooted in [its] Indian jurisprudence," that "'statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit.'" *County of Yakima v. Yakima Indian Nation*, 502 U.S. 251, 269, 112 S.Ct. 683, 693, 116 L.Ed.2d

687 (1992) (quoting *Montana v. Blackfeet Tribe*, 471 U.S. at 766, 105 S.Ct. at 2403). Thus, under *Dion*, the defendants-intervenors must show that there is "clear and plain" evidence that Congress "actually considered" the conflict between the proposed § 233 and the Nation's treaty rights to self-government and exclusive jurisdiction over its internal affairs and chose to resolve the conflict by abrogating the treaty rights. Neither the language nor the legislative history of § 233 support such a conclusion.

■■■■ Nowhere in the language of § 233 is there a "clear and plain" statement that § 233 abrogates the Nation's treaty rights to self-government and exclusive jurisdiction over its internal affairs. Indeed, the Treaty of 1794 is not even mentioned. Nor does the legislative history of § 233 show that Congress intended to abrogate the Nation's treaty rights. To the contrary, the legislative history contains an express disclaimer of any intention to affect treaty rights. S.Rep. No. 1836, 81st Cong., 2d Sess. 2 (1950) ("This proposed legislation expressly subjects the Indians in the State of New York to the civil laws of that State, without impairing any ... rights under existing treaties with the United States."). Accordingly, the Court finds that § 233 does not abrogate the Nation's rights, under the Treaty of 1794, to self-government and exclusive jurisdiction over its internal affairs and the State Court, therefore, has no jurisdiction over this internal dispute.

2. *Indian Tribes' Right of Self–Governance Has Long Been Protected By Federal Law.*

Federal courts have consistently rejected constructions of treaties and statutes that would terminate or diminish tribes' authority over their internal affairs. In *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 8 L.Ed. 483 (1832), the Court held that the Treaty of Hopewell, November 28, 1785, 7 Stat. 18 (1785), between the United States and the Cherokee Nation did not explicitly provide for the termination of tribal control over the internal affairs of the Cherokee Nation despite strong language to that effect. Specifically, Article Nine of the Treaty provided:

For the benefit and comfort of the Indians, and for the prevention of injuries or oppressions on the part of the citizens or Indians, the United States, in Congress assembled, shall have the sole and exclusive right of regulating the trade with the Indians, and managing all their affairs, as they think proper.

*Worcester,* 31 U.S. at 553.

The Court refused to interpret the words "managing all their affairs" as a complete surrender of self-government, holding that to do so would be "a perversion of their necessary meaning." *Id.* 31 U.S. at 554. Rather, the Court held the Cherokee grant to the United States of authority under Article Nine was restricted solely to matters relating to trade, which the Court found was the purpose of Article Nine. The Court considered it "inconceivable that they [the Cherokee] could have supposed themselves, by a phrase thus slipped into an article, on another most interesting subject, to have divested themselves of the right of self-government on subjects not connected with trade." *Id.* The Court interpreted the phrase in the larger context of the balance of Article Nine. Since it "could not be 'for their benefit and comfort,' or for 'the prevention of injuries and oppression'" for the Cherokee to give up all power over their own internal affairs, the Court held that it would be "inconsistent with the spirit" of the Treaty to give the expression that meaning. *Id.* Had the parties to the Treaty truly intended a total surrender of the authority of self-government, the Court reasoned that "it would have been openly avowed." *Id.* 31 U.S. at 554.

In *Ex parte Crow Dog,* 109 U.S. 556, 3 S.Ct. 396, 27 L.Ed. 1030 (1883), the Court subjected the language of a Congressional statute to the same high standard, holding that it did not manifest a sufficiently explicit intent to abolish the inherent powers of self-governance of the Sioux Nation. Article Eight of the Act of 1877, which enacted into law an agreement between the Sioux Indians and the United States, provided:

And Congress shall, by appropriate legislation, secure to them an orderly government; they shall be subject to the laws of the United States, and each individual shall be protected in his rights of property, person and life.

Act of February 28, 1877, 19 Stat. 254. Examining the Article in the context of the entire statute, the Court held that it would violate the spirit of the agreement—which was to allow Congress to take steps to "civilize" the Indians—to construe the article as a surrender of tribal self-governance, or to hold that its terms made Crow Dog subject to the criminal laws of the United States. The Court explained:

The pledge to secure to these people, with whom the United States was contracting as a distinct political body, an orderly government, by appropriate legislation thereafter to be framed and enacted, necessarily implies, having regard to all the circumstances attending the transaction, that among the arts of civilized life, which it was the very purpose of all these arrangements to introduce and naturalize among them, was the highest and best of all, that of self-government, the regulation by themselves of their own domestic affairs, the maintenance of order and peace among their own members by the administration of their own laws and customs.

*Id.* at 568, 3 S.Ct. at 404. Thus, the Court held that the phrase could not "have any more extensive meaning than an acknowledgment of their allegiance as Indians to the laws of the United States." *Id.* at 569, 3 S.Ct. at 404.

As mentioned earlier, in *Talton v. Mayes,* 163 U.S. 376, 16 S.Ct. 986, 41 L.Ed. 196 (1896), the Court held that, despite language in the Treaties of 1835, 7 Stat. 481, and 1866, 14 Stat. 803, between the Cherokee Nation and the United States, providing that the Constitution and the laws of the United States shall apply to the Indian territory, *see id.* at 380–81, 16 S.Ct. at 988, the laws of the Cherokee Nation could not be limited by the United States Constitution. Since the powers of self-government exercised by the Cherokee Nation existed prior to the United States Constitution, the Court held that these powers were not conferred by the national government and were thus not restrained by the Constitution. *Id.* at 384, 16 S.Ct. at 989.

Finally, in *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978), the questions posed were first, whether the Indian Civil Rights Act, 25 U.S.C. § 1302, waived tribal sovereign immunity from suit, and second, whether the Act authorized an implied cause of action to enforce its terms. The Court answered both questions in the negative. With respect to the claim of immunity, the Court held that "a waiver of sovereign immunity cannot be implied, but must be unequivocally expressed." *Santa Clara Pueblo*, 436 U.S. at 58, 98 S.Ct. at 1677 (citations omitted). Applying the rule, the Court found that "[n]othing on the face of [the Indian Civil Rights Act] purports to subject tribes to the jurisdiction of the federal courts in civil actions for injunctive or declaratory relief," *id.* at 59, 98 S.Ct. at 1677, and held that tribal sovereign immunity had not been waived by the Act. The Court also refused to imply a cause of action under the Act. *Id.* at 59–72, 98 S.Ct. at 1677–1684. In so holding, the Court expressed its concern for the protection of tribal self-government in words that have equal application here:

> [P]roviding a federal forum for issues arising under § 1302 constitutes an interference with tribal autonomy and self-government beyond that created by the change in substantive law itself. Even in matters involving commercial and domestic relations, we have recognized that "subject[ing] a dispute arising on the reservation among reservation Indians to a forum other than the one they have established for themselves" may "undermine the authority of the tribal cour[t] . . . and hence . . . infringe on the right of the Indians to govern themselves."

436 U.S. at 59, 98 S.Ct. at 1677 (citations omitted). The Court concluded by stating that "[a]s we have repeatedly emphasized, Congress' authority over Indian matters is extraordinarily broad, and the role of courts in adjusting relations between and among

tribes and their members correspondingly restrained." *Id.* at 72, 98 S.Ct. at 1684.

▮ These cases all support the proposition that an Indian tribe's right to self-government cannot be abrogated absent an unequivocal expression of Congress' intention to do so. Section 233 is not such an expression. The plain language of § 233 does not authorize courts of the State of New York to become embroiled in internal political disputes amongst officials of the Nation's government. If it were Congress' intent to allow the State Courts to have jurisdiction over such disputes, it would have expressly said so, but it did not. Significantly, § 233 does not provide for State Court jurisdiction over suits against the Nation itself.[24] Had Congress intended to abrogate the Nation's rights to self-government and exclusive jurisdiction over internal tribal affairs, it would have made sense for Congress to provide for State Court jurisdiction over suits against the Nation. The fact that it did not, indicates that Congress did not intend for the State Courts to have jurisdiction over these types of internal disputes.

### 3. *Bryan v. Itasca County is Controlling.*

In *Bryan v. Itasca County*, 426 U.S. 373, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976), the Supreme Court held that the grant of jurisdiction set forth in § 4 of Public Law 280, 67 Stat. 589, 28 U.S.C. § 1360 ("P.L. 280"), was limited to "private civil litigation involving reservation Indians in state court." *Id.* at 385, 96 S.Ct. at 2109.[25] At issue in *Bryan* was whether the grant of state civil jurisdiction "over civil causes of action between Indians or to which Indians are parties" set forth in § 4(a) of P.L. 280, was a "congressional grant of power to the States to tax reservation Indians," limited only to the extent that such jurisdiction was specifically excluded by the terms of the statute. 426 U.S. at 375, 96 S.Ct. at 2104. The *Bryan* decision sets forth the principles to be applied in construing a

---

**24.** The Court notes that the Associate Solicitor for Indian Affairs concluded on September 24, 1992, that "[n]either section 232 nor 233 delegates to the State any authority over the Seneca Nation itself or its affairs as a tribe." *See* Memorandum to Eastern Area Director, Bureau of Indian Affairs, from Associate Solicitor, Division of Indian Affairs, Department of the Interior, September 24, 1992 at 3.

**25.** This holding was reaffirmed by the Supreme Court in *Cabazon Band of Mission Indians*, 480 U.S. at 202, 107 S.Ct. at 1083.

statute delegating jurisdiction over Indian affairs to a state, and its analysis applies to the question of whether the grant of civil jurisdiction in § 233 extends state jurisdiction over the internal affairs of the Nation.

Indeed, courts in this Circuit have held that § 233 is to be read in a manner consistent with P.L. 280 and the principles of *Bryan*. In *United States v. Burns*, 725 F.Supp. 116, 125 (N.D.N.Y.1989), the court explained:

> The grant of civil and criminal authority to New York in 25 U.S.C. §§ 232 and 233 is very similar [to] that which was granted to a number of western states in Public Law 280, 18 U.S.C. § 1162, 28 U.S.C. § 1360. The Supreme Court has determined that Public Law 280 does *not* constitute a grant of general regulatory authority to the states to which it applies. *See [Bryan v. Itasca County*, 426 U.S. 373, 385, 96 S.Ct. 2102, 2109, 48 L.Ed.2d 710 (1976); *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987) ]. And, due to the similarities between the statutes, the same is true with respect to the grant of civil jurisdiction found in 25 U.S.C. § 233. *See People v. Snyder*, 141 Misc.2d 444, 532 N.Y.S.2d 827, 830–31 (Co.Ct.1988).

(emphasis in original).

On appeal, the Second Circuit both interpreted § 233 in the same manner as P.L. 280, and relied on *Bryan* in support of this construction, stating that:

> The prohibitory/regulatory distinction was developed to aid in the interpretation of Public Law 280, which granted certain states general criminal and civil (but not regulatory) jurisdiction over specified areas of Indian country. *See [Bryan v. Itasca County*, 426 U.S. 373, 380–81, 96 S.Ct. 2102, 2107, 48 L.Ed.2d 710 (1976) (footnote omitted) ]. The distinction was created to protect Indian sovereignty from interference by the states, precluding states from asserting civil regulatory powers over the

Indian tribes. *United States v. Dakota*, 796 F.2d 186, 187–88 (6th Cir.1986).

*United States v. Cook*, 922 F.2d 1026, 1035 (2d Cir.), *cert. denied*, 500 U.S. 941, 111 S.Ct. 2235, 114 L.Ed.2d 477 (1991).

In *Bryan*, the Court began its analysis by setting out the established rule that in the absence of a congressional grant, states have no authority to tax Indian activity on the reservation, and defining the issue as whether § 4 of P.L. 280 was such a grant. 426 U.S. at 376–77, 96 S.Ct. at 2105–06. The rule is the same here, that is, state jurisdiction over the internal affairs of an Indian tribe would exist only if Congress granted such jurisdiction, and the question presented is whether Congress has done so in § 233.

■ The *Bryan* Court then turned to the language of § 4, which describes the extent of the state court's civil jurisdiction in terms that are nearly identical to § 233. Both statutes extend civil jurisdiction over cases "between Indians" or to which Indians are parties, and both limit the grant of civil jurisdiction to that which the state courts have in other civil cases. Section 4 defines such jurisdiction as existent "to the same extent that such State ... has jurisdiction over other civil causes of action," while § 233 states that it exists "to the same extent as the courts of the State shall have jurisdiction in other civil actions and proceedings." In sum, both statutes define the state courts' jurisdiction in the same basic terms.

Neither statute contains any language that purports to extend state court jurisdiction over the internal affairs of an Indian tribe [26], and there are no court decisions that hold such a construction is proper. As previously stated, there is certainly no "clear and plain" intent in § 233 to terminate the exclusive jurisdiction of the Nation over its internal affairs under the Treaty of 1794, as would be required to support such a construction under *Dion*, 476 U.S. at 738, 106 S.Ct. at 2219.

---

**26.** In contrast to the total absence of any language suggesting a delegation of jurisdiction over internal affairs in § 233, the question presented in *Bryan*—whether § 4 authorized state taxation—was raised by language in § 4(a) that provided that "those civil laws of such State ... that

are of general application to private persons and private parties shall have the same force and effect within such Indian country as they have elsewhere in the State." There is no comparable language in § 233 with respect to the question presented here.

Nor could such a construction satisfy the standard established by the Supreme Court's decisions in *Worcester, Ex parte Crow Dog, Talton,* and *Santa Clara Pueblo* discussed *supra.* Finally, even if such a construction were plausible, it would necessarily be rejected by the rule of construction that ambiguities in statutes affecting Indian rights must be construed in favor of the Indian tribes. As the Court stated in *Bryan:*

> [W]e must be guided by that "eminently sound and vital canon," *Northern Cheyenne Tribe v. Hollowbreast,* 425 U.S. 649, 655 n. 7 [96 S.Ct. 1793, 1797 n. 7, 48 L.Ed.2d 274] (1976), that "statutes passed for the benefit of dependent Indian tribes . . . are to be liberally construed, doubtful expressions being resolved in favor of the Indians." *Alaska Pacific Fisheries v. United States,* 248 U.S. 78, 89 [39 S.Ct. 40, 41, 63 L.Ed. 138] (1918). *See Choate v. Trapp,* 224 U.S. 665, 675 [32 S.Ct. 565, 569, 56 L.Ed. 941] (1912); *Antoine v. Washington,* 420 U.S. 194, 199–200 [95 S.Ct. 944, 948–949, 43 L.Ed.2d 129] (1975).

426 U.S. at 392, 96 S.Ct. at 2112.

The rule is the same today, *Merrion,* 455 U.S. at 152, 102 S.Ct. at 909; *White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 143–44, 100 S.Ct. 2578, 2583–84, 65 L.Ed.2d 665 (1980), and the principle is well-settled. *Montana v. Blackfeet Tribe,* 471 U.S. at 766, 105 S.Ct. at 2403; *County of Oneida,* 470 U.S. at 247, 105 S.Ct. at 1258. Accordingly, the express language of § 233 defeats any claim that it authorizes the State Court to exercise civil jurisdiction over internal tribal affairs.

Even assuming *arguendo* that the language of § 233 could be so construed, application of the *Bryan* analysis still requires rejection of defendants-intervenors' position. The Court's analysis in *Bryan* turned on the legislative history of § 4, and the "canons of construction applicable to congressional stat-utes claimed to terminate Indian immunities." 426 U.S. at 379, 96 S.Ct. at 2106. The same analysis is controlling here.

■ The legislative history of § 233 shows that, like P.L. 280, § 233 was "primarily intended to redress the lack of adequate Indian forums for resolving private legal disputes between reservation Indians, and between Indians and other private citizens, by permitting the courts of the States [in this case New York State] to decide such disputes." *Bryan,* 426 U.S. at 383, 96 S.Ct. at 2108. Section 233 was first introduced as a bill in 1948 along with a companion bill conferring criminal jurisdiction over reservations in New York. *See* 25 U.S.C. § 232. The bills were a response to the Second Circuit's ruling in *United States v. Forness,* 125 F.2d 928, 932 (2d Cir.), *cert. denied sub nom. City of Salamanca v. United States,* 316 U.S. 694, 62 S.Ct. 1293, 86 L.Ed. 1764 (1942) that "state law does not apply to the Indians except so far as the United States has given its consent." Shortly after the *Forness* decision, New York established the Joint Legislative Committee on Indian Affairs which prepared and submitted to Congress drafts of the two bills. *See generally* Gerald Gunther, *Governmental Power and New York Indian Lands—A Reassessment of a Persistent Problem of Federal–State Relations,* 8 Buffalo L.Rev. 1, 14–17 (1958); Comment, *The New York Indians' Right to Self–Determination,* 22 Buffalo L.Rev. 985, 994–96 (1973).

Extensive hearings were held on both bills in 1948. *See Hearings on S. 1683, S. 1686, S. 1687 Before the Subcommittee of the Senate Committee on Interior and Insular Affairs, United States Senate,* 80th Cong., 2d Sess. (1948) (hereinafter "1948 Hearings"). The primary concerns expressed at these hearings were about the perceived jurisdictional void then existing in criminal matters,[27] which the bill proposed to cure by confirming state jurisdiction over criminal cases,[28] and

---

27. Many Indians challenged the idea that there was a jurisdictional void in criminal matters, *see, e.g.,* 1948 Hearings at 107–08, 110, 150, 196, and opposed the legislation. *See id.* at 23–25, 65, 77, 155, 160–62. The Seneca Nation advocated against the legislation, defending its judicial system and presenting a plan to improve the system

to respond to its critics. *Id.* at 47–50 (statement of Calvin John, President of the Seneca Nation).

28. *See, e.g.,* 1948 Hearings at 79–83, 213–15 (testimony of Leighton Wade, Counsel for New York's Joint Legislative Committee on Indian Affairs). Mr. Wade explained the concerns of New York officials:

the ability of Indians to sue or be sued in state courts. The Secretary of the Interior, in his report on the proposed civil bill, noted that but for the Seneca Nation, "none of the New York tribes [had] civil courts to which tribal members might resort for settlement of their disputes." *Id.* at 7. He concluded that "[a]t present the Indians of the New York reservations do not have adequate opportunities for resort to the courts for a redress of wrongs." *Id.* at 8. The need for a forum to adjudicate disputes between Indians and non-Indians was repeated by a representative of the New York Legislative Committee on Indian Affairs. *Id.* at 213–14. There are no indications in the legislative history that Congress intended to permit the State of New York to interfere in internal tribal affairs with the limited grant of civil court jurisdiction.

Of particular concern to Congress was the ability of New York Indians to obtain employment and enter into contracts. Non–Indians feared business dealings with Indians because it was not clear that non-Indians would be able to obtain judgments against Indians in order to enforce the terms of a contract. Leighton Wade, Counsel for New York's Joint Legislative Committee on Indian Affairs, explained that:

> If the implications of the Forness case are true, you couldn't be sure that a person who loaned an Indian $10 would be able to go into the courts of the State of New York and get a judgment—I don't say to touch his reservation land, but even to get a judgment to establish that the Indian owes him the money.

*Id.* at 214. Therefore, he noted:

> The State of New York has no desire to inflict its own laws on the Indians if the Federal government will go about to pro-

vide some laws which will be binding upon these people and will apply to the ordinary relationships and intercourse between other citizens of the State and Indians.

*Id.* at 215.

In a statement submitted to the Congressional Record in 1950, when Congress had before it S. 192, the bill which ultimately became § 233, New York Senator Ives argued:

> The present uncertainties of existing Indian legal status seriously handicap the Indian in the conduct of his daily affairs. A majority of Indians in New York State seek employment outside the boundaries of their reservations. In so doing, they are hindered by any employer's all too understandable reluctance to hire anyone against whom he may have no legal recourse. Contracts entered into by Indians are not enforceable in the State courts. There is considerable doubt as to whether or not Indians can be sued for tort actions. And with the labor market's postwar return to a more normal state of balance, this restriction on an Indian's job-seeking ability will become of increasing significance.

96 Cong.Rec. 8738 (1950). Finally, as stated earlier, the Senate Report accompanying S. 192, stated expressly that § 233 would not affect rights guaranteed to New York Indians under treaty. S.Rep. No. 1836, 81st Cong., 2d Sess. 2 (1950).

Thus, here, as in Bryan, there is nothing in the legislative history of § 233 that:

> remotely suggests that Congress meant the Act's extension of civil jurisdiction to the States should result in the undermining or destruction of such tribal governments as did exist and a conversion of the

---

[I]t has been the view of our committee that the committee didn't care whether the law was of Federal origin, of tribal origin, or of State origin so long as there was a law.... *The United States v. Forness,* in 1942, we believe, changed matters greatly because up to that time there had been this prevailing notion that there was a dovetailing of jurisdiction between the State and Federal Government. Now all of that is questioned. So, according to those who are opposed to any assertion of State authority, every act of the State law-enforcing officials is

challenged. It is a question of whether they have any right to do it. So there is a void if there [sic] claims are correct. It is very unsettling and very unwholesome, it seems, for not only the Indians but for the large number of other citizens who are neighbors of the Indians.

*Id.* at 83; *accord Id.* at 5–6 (Report of the Secretary of the Interior on S. 1683); *Id.* at 187 (statement of Congressman Daniel Reed (N.Y.)); *Id.* at 53 (Statement of Sen. Watkins (Utah)).

affected tribes into little more than " 'private, voluntary organizations,' " *United States v. Mazurie,* 419 U.S. 544, 557 [95 S.Ct. 710, 718, 42 L.Ed.2d 706] [ ] (1975)
. . .

*Bryan,* 426 U.S. at 388, 96 S.Ct. at .2110.

· In sum, applying the Supreme Court's analysis in *Bryan* to § 233, the Court finds that § 233 was not intended by Congress to be a grant of jurisdiction to the State Courts over the internal affairs of the Nation. The plain language of § 233 does not support such a grant of jurisdiction. Nor does the legislative history. Indeed, the legislative history shows, as in *Bryan,* that Congress only intended to grant State Courts jurisdiction over private civil litigation between ·Indians and between Indians and non-Indians. This result is consistent with the reality that the existence of the Nation as a separate sovereign cannot be reconciled with a grant of jurisdiction to another government to exercise jurisdiction over the Nation's internal affairs.

■ Defendants-intervenors argue that the four provisos in § 233 constitute the only exceptions to the grant of jurisdiction contained in § 233. This argument, however, was rejected by the Supreme Court in *Bryan,* 426 U.S. at 379–83, 96 S.Ct. at 2106–08. The provisos contained in § 233 are nearly identical to those contained in P.L. 280, and the Court's analysis in *Bryan,* 426 U.S. at 391, 96 S.Ct. at 2112, regarding the provisos in § 4(b) of P.L. 280 applies to § 233 as well:

> Indeed, § 4(b) in its entirety may be read as simply a reaffirmation of the existing reservation Indian–Federal Government relationship in all respects save the conferral of state-court jurisdiction to adjudicate private civil causes of action involving Indians. We agree with the Court of Appeals for the Ninth Circuit that § 4(b) "is entirely consistent with, and in effect is a reaffirmation of, the law as it stood prior to its enactment." *Kirkwood v. Arenas,* 243 F.2d 863, 865–66 (1957).

Thus, § 233 had no effect on the Nation's exclusive authority over its internal affairs.

Defendants-intervenors also argue that Congress' intent to grant State Courts jurisdiction over all disputes. between Indians, regardless of the nature of the dispute, is evident by the language in § 233 that permits · the State Court to apply "tribal law or custom which may be proven to the satisfaction of such courts." In fact, defendants-intervenors argue, Justice Doyle has applied only tribal law in the State Court action and there is, therefore, no threat to the Nation's sovereignty. The Court finds this argument without merit.

■ It makes no difference that the State Court would be applying only tribal law. Indeed, the threat to tribal sovereignty arises from that very fact: the Nation's internal affairs would be controlled by the rulings and interpretations of the Nation's laws by a court of a different sovereign. As the Supreme Court held in *LaPlante,* 480 U.S. at 16, 107 S.Ct. at 976, the adjudication of any case arising on the reservation and involving Indians "by any nontribal court . . . infringes upon tribal lawmaking authority." Such an adjudication "cannot help but unsettle a tribal government's ability to maintain authority." *Santa Clara Pueblo,* 436 U.S. at 60, 98 S.Ct. at 1678. The Court held in *Bryan,* interpreting similar language in § 4(c) of P.L. 280 providing for the application of "tribal ordinances and customs" by state courts, that such language actually "contemplates the continuing vitality of tribal government," 426 U.S. at 389, 96 S.Ct. at 2111, not its demise.

The problem with state courts applying tribal law to internal tribal disputes is perhaps highlighted by this case. Despite defendants-intervenors assurances to the contrary, it appears that the State Court did not follow the Nation's laws in this instance. The State Court held in its December 22 Decision that the doctrine of sovereign immunity did not prevent the State Court from entertaining jurisdiction because the State Court action is based on allegations that Bowen acted outside the scope of his tribal authority. While Nation law allows at least some types of actions against tribal officials for acts committed outside the scope of their authority, *see* Article 22 of the Seneca Nation

of Indians Peacemakers' Court and Surrogate's Court Civil Procedure Rules, and recognizes an implied cause of action to enforce the Nation's Constitution, the Nation's courts have held that such actions are within the exclusive jurisdiction of the Peacemakers Court. *See Abrams v. Snyder,* Civil Action No. 0518–94 (Seneca Nation of Indians Peacemakers Court August 22, 1994). Thus, had the State Court strictly followed tribal law, it would have dismissed defendants-intervenors action under the *Abrams* case.

In conclusion, the Court finds that there is nothing in § 233 that grants jurisdiction to the State Courts over the internal affairs of the Nation. Thus, because the dispute before the State Court clearly involves the internal affairs of the Nation, the State Court lacks jurisdiction.

C. *Federal Law Requires that the Matter be Addressed in the Nation's Peacemakers Court.*

▮▮▮▮ Even if the Court assumes, *arguendo,* that 25 U.S.C. § 233 permits State Court jurisdiction over the type of internal tribal dispute present here, well-established rules of federal law require that the dispute be resolved in the Nation's Peacemakers Court—where the dispute between the parties was first filed. The Supreme Court has established a policy of abstention in favor of tribal court jurisdiction. Under that policy, civil disputes that arise on the reservation and involve Indians presumptively lie within the jurisdiction of the tribal court. *Iowa Mut. Ins. Co. v. LaPlante,* 480 U.S. 9, 107 S.Ct. 971, 94 L.Ed.2d 10 (1987); *National Farmers Union Ins. Cos. v. Crow Tribe,* 471 U.S. 845, 105 S.Ct. 2447, 85 L.Ed.2d 818 (1985); *Wellman v. Chevron USA, Inc.,* 815 F.2d 577, 578 (9th Cir.1987). The courts in New York have applied a similar rule of deference to tribal court proceedings. *Jim-*

*erson v. Halftown Estate,* 44 Misc.2d 1028, 255 N.Y.S.2d 627 (1963), *aff'd,* 22 A.D.2d 417, 419, 255 N.Y.S.2d 959, 961 (3d Dept.1965).

1. *The Doctrine of Exhaustion of Tribal Remedies Should Have Equal Application to State Courts as Well as Federal Courts.*

▮▮▮ The rule of abstention in favor of tribal court jurisdiction set out in *LaPlante* and *National Farmers Union* was developed by the Supreme Court in connection with federal court adjudication of controversies arising on Indian reservations or involving Indians. As the Court found, because federal and tribal courts often have concurrent jurisdiction over such controversies, absent deference to the tribal court, few if any such controversies (especially those involving non-Indians) would ever be heard in the tribal court. Accordingly, federal courts having concurrent jurisdiction over the controversy are directed to abstain pending resolution of the matter in the tribal court. *LaPlante,* 480 U.S. at 16–17, 107 S.Ct. at 976–977; *National Farmers Union,* 471 U.S. at 856–57, 105 S.Ct. at 2453–54. The abstention rule applies even if: (a) the dispute involves non-Indians [29]; (b) tribal court jurisdiction is uncertain [30]; or (c) no action is in fact pending in the tribal court at the time the federal action is filed.[31] "The requirement of exhaustion of tribal remedies is not discretionary; it is mandatory." *Burlington N. R.R. v. Crow Tribal Council,* 940 F.2d 1239, 1245 (9th Cir.1991). Although *LaPlante* and *National Farmers Union* apply this exhaustion rule to actions in federal court, those decisions, and the well-established rule that state courts generally lack jurisdiction over Indian activities on Indian lands,[32] compel application of the exhaustion rule to the controversy at issue here—which involves matters relat-

---

**29.** *Id.; Texaco, Inc. v. Zah,* 5 F.3d 1374, 1376–77 (10th Cir.1993).

**30.** *Texaco, Inc. v. Zah,* 5 F.3d at 1376–77; *Espil v. Sells,* 847 F.Supp. 752, 756–60 (D.Ariz.1994).

**31.** *Middlemist v. United States,* 824 F.Supp. 940, 944 (D.Mont.1993), *aff'd,* 19 F.3d 1318 (9th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 420, 130 L.Ed.2d 335 (1994); *Crawford v. Genuine Parts*

*Co.,* 947 F.2d 1405, 1407 (9th Cir.1991), *cert. denied,* 502 U.S. 1096, 112 S.Ct. 1174, 117 L.Ed.2d 419 (1992); *Wellman,* 815 F.2d at 578; *Tom's Amusement Co. v. Cuthbertson,* 816 F.Supp. 403 (W.D.N.C.1993).

**32.** *LaPlante,* 480 U.S. at 15, 107 S.Ct. at 976; *Fisher,* 424 U.S. at 388–89, 96 S.Ct. at 947–48; *Williams,* 358 U.S. at 223, 79 S.Ct. at 272.

ing exclusively to the Nation's internal governance.

██ The Supreme Court in *LaPlante* explained that civil jurisdiction over activities on reservation lands—including activities of non-Indians—"presumptively lies in the tribal courts unless affirmatively limited by a specific treaty provision or federal statute." 480 U.S. at 18, 107 S.Ct. at 977. In applying the exhaustion rule to dismiss a federal suit between an out-of-state insurance company and members of an Indian tribe, the Court expressly discussed the very limited authority of state courts in matters arising on reservations, stating that "[i]f state-court jurisdiction over Indians or activities on Indian lands would interfere with tribal sovereignty and self-government, the state courts are generally divested of jurisdiction as a matter of federal law." *Id.* at 15, 107 S.Ct. at 976. The Court concluded that assumption of jurisdiction over reservation affairs "by any nontribal court also infringes upon tribal lawmaking authority, because tribal courts are best qualified to interpret and apply tribal law." *Id.* at 16, 107 S.Ct. at 977.

As discussed extensively above, the limited scope of state jurisdiction over matters arising between Indians on Indian reservations is well-established. Precisely the same interests—protection of tribal sovereignty, including enhancement of the authority of the tribal courts, as well as interests of judicial economy—underlie both the tribal court exhaustion doctrine and the rules against state jurisdiction over reservation issues. As set out in *National Farmers Union* and *LaPlante*, the tribal court exhaustion doctrine is predicated first, on recognition that Indian tribes retain sovereignty over both their members and their territory. Respect for tribal self-government "favors a rule that will provide the forum whose jurisdiction is being challenged the first opportunity to evaluate the factual and legal bases for the challenge." *National Farmers Union,* 471 U.S. at 856, 105 S.Ct. at 2454; *LaPlante,* 480 U.S. at 15–17, 107 S.Ct. at 976–977; *accord Santa Clara Pueblo,* 436 U.S. at 59, 98 S.Ct. at 1677. The protection of tribal sovereignty was equally critical to the Supreme Court's decision rejecting state civil jurisdiction in *Fisher v.*

*District County Court* as demonstrated by the Court's statement that "[s]tate-court jurisdiction plainly would interfere with the powers of self-government conferred upon the ... Tribe and exercised through the Tribal Court" by subjecting "a dispute arising on the reservation among reservation Indians to a forum other than the one they have established for themselves." *Fisher,* 424 U.S. at 387–88, 96 S.Ct. at 947; *accord Williams,* 358 U.S. at 223, 79 S.Ct. at 272. Both the tribal court exhaustion doctrine, and the rule against state assumption of jurisdiction over matters of internal tribal affairs, reflect recognition that adjudication of cases arising on reservations involving Indians "by any nontribal court ... infringes upon tribal lawmaking authority, because tribal courts are best qualified to interpret and apply tribal law." *LaPlante,* 480 U.S. at 16, 107 S.Ct. at 977. Such litigation in a forum other than the tribe's simply "cannot help but unsettle a tribal government's ability to maintain authority." *Santa Clara Pueblo,* 436 U.S. at 60, 98 S.Ct. at 1678. The same disruption occurs whether it is a federal or a state court that asserts jurisdiction over a civil dispute that is otherwise within the tribal court's authority. As the Supreme Court explained in *Fisher,* when a state court assumes jurisdiction over a matter within the jurisdiction of the tribal court it causes "a corresponding decline in the authority of the Tribal Court." 424 U.S. at 388, 96 S.Ct. at 947; *see also United States v. Plainbull,* 957 F.2d 724, 728 (9th Cir.1992) ("both state courts and federal courts would undermine the ability of tribes to govern themselves by exercising jurisdiction over activities taking place on tribal lands").

Finally, both the tribal court exhaustion doctrine and the presumption against state jurisdiction over civil disputes arising on a reservation are intended to serve "the orderly administration of justice." *National Farmers Union,* 471 U.S. at 856, 105 S.Ct. at 2454. By abstaining in favor of tribal court adjudication, the courts avoid the "procedural nightmare[s]" that otherwise arise if more than one court attempts to resolve the dispute. *Id.* at 856–57, 105 S.Ct. at 2453–54. This same factor was relevant to the Supreme Court's rejection of state court juris-

diction in *Fisher*, where the Court explained that the state's assumption of jurisdiction "would create a substantial risk of conflicting adjudications affecting the custody of the child." 424 U.S. at 388, 96 S.Ct. at 947.

The New York Courts, although not expressly referring to the Supreme Court's decisions in *National Farmers Union* or *La-Plante*, have in fact adopted a rule of comity which requires that the state courts decline jurisdiction in favor of a previously-filed suit in tribal court covering the same parties and same subject matter. *Jimerson v. Halftown Estate*, 44 Misc.2d 1028, 255 N.Y.S.2d 627 (1963), *aff'd*, 22 A.D.2d 417, 419, 255 N.Y.S.2d 959, 961 (3d Dept.1965). In *Jimerson*, the Court stated that "[i]t has been repeatedly held that where Peacemakers' Courts exist that the State court may not interfere with the determination of such Peacemakers' Courts" and refused to pass on the merits of the Nation's final decision concerning a property dispute. *Id.* 44 Misc.2d at 1031, 255 N.Y.S.2d at 630. Affirming that decision on appeal, the Appellate Division of the New York Supreme Court stated:

> there is applicable the familiar rule that the court of concurrent jurisdiction "which first obtains jurisdiction with adequate power to administer full justice should continue to exercise it." ... Further, there exists no provision of law providing for review of.decisions of the Indian courts by any State court.

22 A.D.2d at 419, 255 N.Y.S.2d at 961 (quoting *Colson v. Pelgram*, 259 N.Y. 370, 182 N.E. 19 (1932)).[33]

The ruling in *Jimerson* reflects concern for the same principles articulated by the United States Supreme Court in *LaPlante, National Farmers Union* and *Fisher*—recognition of tribal sovereignty and the authority of the tribal court in matters affecting reservation Indians, as well as an interest in "the orderly administration of justice" and the avoidance

of procedural problems that would otherwise arise if more than one court attempts to resolve the dispute. The trial court's decision in *Jimerson*, 44 Misc.2d at 1031–33, 255 N.Y.S.2d at 630–31, was predicated on the principles expressed in *Patterson v. Council of the Seneca Nation*, 245 N.Y. 433, 157 N.E. 734 (1927) and *People ex rel. Jimeson v. Shongo*, 83 Misc. 325, 144 N.Y.S. 885 (1913). *Patterson* recognizes that "the Peacemakers Court is the creation not of the State but of the Indian constitution" and that matters concerning Nation law should be decided by the Nation. 245 N.Y. at 445–46, 157 N.E. at 738. While *Shongo* explained that a "determination of the Peacemakers Court, affirmed by the council of the nation, is conclusive as to the rights of the parties, and [the state court] is powerless, for want of jurisdiction, to grant any relief."[34] 83 Misc. at 328, 144 N.Y.S. at 886.

In sum, the Court finds that, in the instant situation, the State Court was required to follow the rule of abstention in favor of tribal court jurisdiction set out in *LaPlante* and *National Farmers Union* and should have abstained in favor of the Peacemakers Court proceeding. The underlying dispute is wholly an internal matter. It involves only Nation members, arises on the reservation, and concerns the allocation of power within the Nation's government. The Peacemakers Court is clearly the best qualified to interpret and apply Nation law. *LaPlante*, 480 U.S. at 16, 107 S.Ct. at 976. Even if 25 U.S.C. § 233 were to allow the State Court concurrent jurisdiction over the subject matter of this controversy, assumption of such jurisdiction by the State Court would clearly undermine the Peacemakers Court's authority to resolve the dispute. The State Court action impermissibly places the State Court in direct competition with tribal court processes—not only impairing tribal court authority and tribal self-government in

---

**33.** In *Colson*, the New York Court of Appeals directed that "where separate actions have been instituted between the same parties in reference to the same subject-matter in courts having concurrent jurisdiction the court which first obtains jurisdiction with adequate power to administer full justice should continue to exercise it." 259 N.Y. at 375, 182 N.E. at 22.

**34.** *Cf. John v. Hoag*, 131 Misc.2d 458, 466–68, 500 N.Y.S.2d 950, 956–57 (1986) (stating rule set out in *Jimerson* but distinguishing it on the grounds that no formal complaint had been filed in the Peacemakers Court since there was no action pending in that court).

precisely the way *LaPlante, National Farmers Union, Williams,* and *Fisher* forbid, but also creating "procedural nightmares" by subjecting the parties to contradictory orders from the two different courts, with risk of serious sanction by both courts for non-compliance.

For example, the Peacemakers Court issued an Order restraining Ross John, Sr. from sitting on the Council. The State Court subsequently issued an Order allowing Ross John, Sr. to sit on the Council. The State Court's Order clearly contravened the earlier Peacemakers Court's Order. This Court would be hard-pressed to find a better example of why the rule of abstention in favor of tribal court jurisdiction should apply to state courts as well as federal courts.

2. *The Fact that the Peacemakers Court Action and the State Court Action are not Identical in All Aspects Does not Bar Application of the Rule of Abstention in Favor of Tribal Court Jurisdiction.*

The defendants-intervenors argue that the rule of abstention in favor of tribal court jurisdiction should not apply in this instance because the two actions are not identical. They point out that there is not a complete identity between the parties and claims in the two actions and argue that the State Court, therefore, was not required to defer. The Court finds this argument without merit.

■ There is no requirement that the tribal court action must be identical to the federal or state court action before the rule of abstention applies. Indeed, the tribal court exhaustion doctrine applies even where no action is actually pending in a tribal court. *See Crawford,* 947 F.2d at 1407; *Wellman,* 815 F.2d at 577. Such an "identical action" requirement would allow litigants to avoid the abstention rule by simply adding parties or artfully drafting their pleadings, thereby rendering the rule nugatory.

■ Moreover, the Peacemakers Court action is for all practical purposes identical to the State Court action. The two actions involve the same subject matter and the claims asserted in each action flow from the same core controversy—which is whether Ross John, Sr. has the right to sit on the Council. Resolution of that issue—which was initially presented to the Peacemakers Court—should, in large measure, resolve the remaining issues. Thus, the Court finds that there are no differences in the two proceedings that would justify simultaneous litigation in two different courts.

3. *Allegations that the Tribal Court is Corrupt or Biased Must First be Presented in and Decided by the Tribal Court.*

■ The defendants-intervenors argue that the tribal court exhaustion requirement should not apply in this instance because the Peacemakers Court has been corrupted by Bowen and is biased against the defendants-intervenors. Allegations that a tribal court is corrupt or biased, however, are no basis for denying the tribe a right to adjudicate the dispute. In *National Farmers Union,* the Supreme Court identified three circumstances under which tribal court exhaustion might not be required:

> where an assertion of tribal jurisdiction "is motivated by a desire to harass or is conducted in bad faith," ... or where the action is patently violative of express jurisdictional prohibitions, or where exhaustion would be futile because of the lack of an adequate opportunity to challenge the court's jurisdiction.

*National Farmers Union,* 471 U.S. at 856 n. 21, 105 S.Ct. at 2454 n. 21 (citations omitted). However, that Court and the federal courts since then, have declined to apply the exception based solely on allegations of tribal court bias or incompetence.[35] Moreover, the federal courts have refused to adjudicate the competency or impartiality of the tribal court as a forum. Instead, the federal courts have consistently required that such allegations be

---

35. In *LaPlante,* the Supreme Court explained that "[t]he alleged incompetence of tribal courts is not among the exceptions to the exhaustion requirement established in *National Farmers Un-* ion and would be contrary to the congressional policy promoting the development of tribal courts." *LaPlante,* 480 U.S. at 19, 107 S.Ct. at 978 (citations omitted).

addressed, in the first instance, in the tribal court itself.

For example, in *A & A Concrete, Inc. v. White Mountain Apache Tribe*, 781 F.2d 1411, 1416–17 (9th Cir.1986), the court rejected allegations that the non-Indian contractor would be denied due process in tribal court because the Chief Judge of the tribal court lacked "adequate legal training" and was allegedly "biased by her connection with the tribal council." *Id.* at 1416–17. The court held that such challenges must be asserted in the first instance in the tribal court itself. *Id.*

A futility argument was likewise rejected in *Middlemist*, 824 F.Supp. at 940. There, the court rejected the plaintiff's contention "that exhaustion would be futile because of a lack of an adequate opportunity to challenge the Tribal Court's jurisdiction." *Id.* at 946. Although the plaintiff's arguments included "allegations that the ... [tribal decision-makers had] prejudged the issue, that they lack[ed] independence from the Tribal Council and Tribal Legal Department, and that they [were] biased," the Court concluded that "arguments questioning the competency and neutrality of tribal courts have long been a mainstay in attacks on tribal jurisdiction by non-Indians and have been consistently rejected." *Id.* (citations omitted). Similar conclusions have been reached by other federal courts.[36]

These decisions have equal application here. Allegations of corruption, bias or error by the Peacemakers Court must be presented first to the Peacemakers Court for resolution. Any alleged error in the Peacemakers Court decision can and should be reviewed in the Nation's Court of Appeals. A litigant cannot avoid the tribal court exhaustion requirement by declining to pursue appellate remedies that are available in the tribal court system. *See Wetsit v. Stafne*, 44 F.3d 823, 825 (9th Cir.1995).

4. *25 U.S.C. § 233 does not Preempt the Tribal Court Exhaustion Requirement.*

Nothing about 25 U.S.C. § 233 overrides or affects the federal policy of deference to tribal courts. Even assuming, *arguendo*, that § 233 creates concurrent jurisdiction to adjudicate the controversy, the Supreme Court in *National Farmers Union* and *LaPlante*, rejected the argument that a grant of concurrent jurisdiction creates an exception to the tribal court exhaustion rule. The rule is most clearly illustrated by *LaPlante*. In *LaPlante*, a private insurance company brought suit in federal court under the diversity jurisdiction statute, 28 U.S.C. § 1332, against members of the Blackfeet Tribe in a dispute arising from an automobile accident that had occurred on the reservation. The insurance company argued that the diversity statute overrode the policy of deference to tribal courts especially because the grant of diversity is intended to "protect[ ] against local bias and incompetence." *LaPlante*, 480 U.S. at 18, 107 S.Ct. at 978. The Court rejected the argument and concluded that "[r]egardless of the basis for jurisdiction, the federal policy supporting tribal self-government" mandates exhaustion. *Id.* at 16, 107 S.Ct. at 976; *see also Santa Clara Pueblo*, 436 U.S. at 59, 98 S.Ct. at 1677.

The same principles control here. Even if 25 U.S.C. § 233, like 28 U.S.C. § 1332, creates concurrent jurisdiction over the subject matter of this controversy, that fact does not alter or preempt the presumption of tribal court jurisdiction or the policy in favor of deference to tribal court jurisdiction over disputes arising on the reservation.

D. *The State Court Action is Barred by the Doctrine of Tribal Sovereign Immunity.*

As the Second Circuit held in *Fluent v. Salamanca Indian Lease Auth.*, 928 F.2d 542 (2d Cir.), *cert. denied*, 502 U.S.

---

**36.** *See, e.g., Duncan Energy Co. v. Three Affiliated Tribes of the Fort Berthold Reservation*, 27 F.3d 1294, 1300–01 (8th Cir.1994), *cert. denied*, — U.S. ——, 115 S.Ct. 779, 130 L.Ed.2d 673 (1995); *Texaco, Inc. v. Zah*, 5 F.3d at 1376–77; *Bank of Oklahoma v. Muscogee (Creek) Nation*, 972 F.2d 1166, 1170 (10th Cir.1992); *Espil*, 847 F.Supp. at 757; *Kaul v. Wahquahboshkuk*, 838 F.Supp. 515, 518 (D.Kan.1993).

818, 112 S.Ct. 74, 116 L.Ed.2d 48 (1991), "Indian tribes have long been recognized as possessing the common-law immunity from suit traditionally enjoyed by sovereign powers." *Id.* at 545 (quoting *Santa Clara Pueblo,* 436 U.S. at 58, 98 S.Ct. at 1676; *Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe,* 498 U.S. 505, 111 S.Ct. 905, 112 L.Ed.2d 1112 (1991)). A tribe's sovereignty, however, is subject to Congress' plenary control and tribal immunity may, therefore, be waived by Congress. *Id.* Such a waiver "cannot be implied but rather must be 'unequivocally expressed.'" *Id.* (quoting *Santa Clara Pueblo,* 436 U.S. at 58–59, 98 S.Ct. at 1676–1677). Defendants-intervenors do not suggest here, nor could they, that § 233 waives the Nation's tribal sovereign immunity. There is notably absent in § 233 any conferral of state jurisdiction over the tribes themselves, much less an unequivocal expression of a waiver of tribal sovereign immunity. *See Bryan,* 426 U.S. at 389, 96 S.Ct. at 2111.

The defendants-intervenors argue that the doctrine of tribal sovereign immunity is not implicated in the State Court action because that action is brought against Bowen in his individual capacity for acts allegedly committed by Bowen outside the scope of his tribal authority. In other words, defendants-intervenors contend that Bowen is not immune from suit under the theory enunciated by the Supreme Court in *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). The Court finds this argument without merit.

1. *The Young Doctrine does not Apply to Tribal Law Claims.*

The Supreme Court's decision in *Santa Clara Pueblo* suggests that federal law is enforceable against tribal officials under the doctrine of *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), but only if a cause of action exists to enforce the federal law claimed to have been violated. 436 U.S. at 59, 98 S.Ct. at 1677. While the holding in *Santa Clara Pueblo,* that an implied cause of action to enforce the Indian Civil Rights Act, 25 U.S.C. § 1302, does not exist, made it unnecessary to decide the issue, the lower federal courts have held the *Young* doctrine

applicable in actions alleging that tribal officials violated federal law. *See, e.g., Burlington N. R.R. v. Blackfeet Tribe,* 924 F.2d 899, 902 (9th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 3013, 120 L.Ed.2d 887 (1992); *Wisconsin v. Baker,* 698 F.2d 1323, 1332–33 (7th Cir.1983), *cert. denied,* 463 U.S. 1207, 103 S.Ct. 3537, 77 L.Ed.2d 1388 (1983). The Court has not located, however, any federal cases holding that the *Young* doctrine is applicable where, as here, the tribal official is alleged to have violated tribal, not federal, law.

The *Young* doctrine applies only to cases where it is alleged that the government official's action violates the "supreme authority of the United States." *Young,* 209 U.S. at 160, 28 S.Ct. at 454. Indeed, the central premise of *Young* is that "[t]he State has no power to impart to [a state official] any immunity from responsibility to the supreme authority of the United States." *Id.* As the Supreme Court explained in *Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984), "*Ex parte Young* was the culmination of efforts by [the United States Supreme Court] to harmonize the principles of the Eleventh Amendment with the effective supremacy of rights and powers secured elsewhere in the Constitution." *Id.* at 105, 104 S.Ct. at 910 (citations omitted). "[T]he *Young* doctrine rests on the need to promote the vindication of federal rights." *Id.* (citations omitted).

Accordingly, as the Court held in *Pennhurst,* the *Young* doctrine does not apply to claims that a state official is acting in violation of state—rather than federal—law. As the Court explained:

> In such a case the entire basis for the doctrine of *Young* ... disappears. A federal court's grant of relief against state officials on the basis of state law, whether prospective or retroactive, does not vindicate the supreme authority of federal law. On the contrary, it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law. Such a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment. We con-

clude that *Young* ... [is] inapplicable in a suit against state officials on the basis of state law.

465 U.S. at 106, 104 S.Ct. at 911.

■ The Court's rationale in *Pennhurst* compels the same result when tribal law is at issue. In this context, as in *Pennhurst*, "it is difficult to think of a greater intrusion" on tribal sovereignty than when a state court instructs Nation officials "on how to conform their conduct" to Nation law. In *Pennhurst*, such a result was held to "conflict[ ] directly with the principles of federalism that underlie the Eleventh Amendment." *Id.* at 106, 104 S.Ct. at 911. In the tribal context, this result conflicts directly with the tribal right of self-government. In sum, there is no state or federal interest served by providing a forum other than the tribal court for the resolution of internal tribal disputes, and as a matter of federal law, the *Pennhurst* rule bars the state and federal courts from applying the *Young* doctrine to a tribal law claim.[37]

2. *The State Court Action is Barred by the Doctrine of Sovereign Immunity Because the Relief Sought From and Granted by the State Court is Effectively Against the Nation.*

■ Even if it is assumed, *arguendo*, that the *Young* doctrine is applicable where a tribal official is alleged to have violated only tribal law, the doctrine of sovereign immunity would still bar the State Court action in this instance. The *Young* doctrine does not apply to an action that is in reality against the sovereign. *Pennhurst*, 465 U.S. at 101–02, 104 S.Ct. at 908–09. "[A] suit is against the sovereign if the judgment would expend itself on the public treasury or domain, or interfere with the public administration, or if the effect of the judgment would be to restrain the Government from acting, or to compel it to act." *Id.* at 101 n. 11, 104 S.Ct. at 909 (citations omitted).

■ Applying this standard, the Court finds that the State Court action is effectively against the Nation. The Orders issued by the State Court operate directly against the government of the Nation, interfere with the public administration of the Nation, restrain and compel action by the Nation's government, and require the expenditure of the Nation's treasury. Specifically, the Orders purport to: (a) decide who is a member of the Nation's Council; (b) direct when the Council, as constituted by the State Court, is to meet and how the Council is to conduct its business; (c) void actions taken by the Council and the President; (d) order the Nation's police officers to enforce the State Court's Orders against the President; and (e) require the payment of salaries and continued employment of Nation employees. Thus, because the State Court action is effectively against the Nation, it is barred by the doctrine of tribal sovereign immunity.

E. *Paramount Federal Interests in Protecting Indian Tribal Sovereignty Require that this Court Enjoin the State Court Action and Override All Abstention Principles.*

■ "Federal courts have a 'virtually unflagging obligation' to exercise the jurisdiction granted them by Congress." *Seneca–Cayuga Tribe v. State ex rel. Thompson*, 874 F.2d 709, 711 (10th Cir.1989); *accord New Orleans Public Serv. v. New Orleans*, 491 U.S. 350, 358–59, 109 S.Ct. 2506, 2512–14, 105 L.Ed.2d 298 (1989). Although, on "rare occasions," the federal courts are required to abstain in favor of the state courts, abstention is only warranted "where such inaction is necessary to avoid undue interference with states' conduct of their own affairs." *Seneca–Cayuga*, 874 F.2d at 711. "[A]bstention is an 'extraordinary and narrow exception' to a district court's role as adjudicator of a ripe controversy." *Fort Belknap Indian Community v. Mazurek*, 43 F.3d 428, 431 (9th Cir.1994) (citations omitted); *accord Tohono O'odham Nation v. Schwartz*, 837 F.Supp. 1024 (D.Ariz.1993).

**37.** As stated earlier, the Nation's courts have, in effect, recognized and applied the *Young* doctrine in actions against tribal officials, but have held that such actions are within the exclusive jurisdiction of the Nation's courts. *See Abrams v. Snyder*, Civil Action No. 0518–94 (Seneca Nation of Indians Peacemakers Court August 22, 1994).

Here, abstention is inappropriate as the critical issue—whether the State Court has authority to enter orders directing how an Indian tribe may govern itself—is a federal question, and New York has no interest in the subject matter of the underlying controversy. Thus, federal jurisdiction is not precluded by either the Anti–Injunction Act, 28 U.S.C. § 2283, or the *Younger* abstention doctrine, or the *Rooker/Feldman* doctrine, or the Supreme Court's decision in *United States ex rel. Kennedy v. Tyler*, 269 U.S. 13, 46 S.Ct. 1, 70 L.Ed. 138 (1925).

### 1. The Anti–Injunction Act

The Anti–Injunction Act, 28 U.S.C. § 2283 [38], does not preclude a federal court from enjoining a state court proceeding where such action: (a) has been "expressly authorized by Act of Congress"; (b) is necessary in aid of the federal court's jurisdiction; or (c) is necessary to effectuate a federal court's judgments. All three exceptions apply here.

First, this action is expressly authorized by Act of Congress. This case is brought not only under 28 U.S.C. §§ 1331 and 1362 [39], but also under 28 U.S.C. § 1343 and 42 U.S.C. § 1983 to enjoin state officials, New York Supreme Court Justices Doyle and Wolfgang, acting under "color of state law," from depriving the plaintiff of rights protected by the Constitution and laws of the United States. The Supreme Court has specifically held that 42 U.S.C. § 1983 is a statute that "expressly authorizes" federal court injunctions against state court proceedings, and such suits are not subject to the bar of the Anti–Injunction Act. *Mitchum v. Foster*, 407 U.S. 225, 243, 92 S.Ct. 2151, 2162, 32 L.Ed.2d 705 (1972). Furthermore, the Supreme Court has held that Indian treaty rights, including the right of self-governance, are protected by the United States Constitution. *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 8 L.Ed. 483 (1832); *Fisher*, 424 U.S. at 386, 96 S.Ct. at 946; *Antoine*, 420 U.S. at 205, 95 S.Ct. at 951; *Lac Courte Oreilles Band v. Wisconsin*, 668 F.Supp. 1233, 1239 (W.D.Wis.1987). Accordingly, such rights may be vindicated by suits brought under § 1983.[40]

Second, the Anti–Injunction Act permits injunctions of state court proceedings where "necessary in aid of [federal] jurisdiction." 28 U.S.C. § 2283. This exception has been expressly held to permit Indian tribes to bring federal court suits to enjoin state court proceedings where the threshold issue is whether the state court has jurisdiction over the subject matter of the dispute. *Sycuan Band of Mission Indians v. Roache*, 38 F.3d 402, 407–08 (9th Cir.1994); *White Mountain Apache Tribe v. Smith Plumbing Co.*, 856 F.2d 1301, 1304 (9th Cir.1988); *Tohono O'odham*, 837 F.Supp. at 1024. Two principles underlie these courts' holdings: the well-established rules protecting Indian tribes' interests in their sovereignty and property, and the primacy of federal authority in Indian affairs.

Applying these principles, the Ninth Circuit in *Sycuan*, upheld a federal court injunction of state criminal proceedings against employees of the tribe's gaming establishments pending the federal court's determina-

---

**38.** The Anti–Injunction Act provides:
A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments.

**39.** The Anti–Injunction Act also does not apply because this action is brought by the plaintiff in his official capacity as President of the Nation under 28 U.S.C. § 1362. The Anti–Injunction Act does not apply to Indian tribes suing under 28 U.S.C. § 1362 where the same action could have been brought by the United States as trustee for the tribe. *Cayuga Indian Nation of New York v. Fox*, 544 F.Supp. 542, 551 n. 5 (N.D.N.Y. 1982).

**40.** *United States v. Washington*, 935 F.2d 1059, 1061 (9th Cir.1991); *United States v. Washington*, 459 F.Supp. 1020, 1030 n. 3 (W.D.Wash.1978) *appeal dismissed*, 573 F.2d 1117 (9th Cir.1978); *Lac Courte Oreilles Band v. Wisconsin*, 663 F.Supp. 682, 691 (W.D.Wis.), *appeal dismissed*, 829 F.2d 601 (7th Cir.1987); *Mille Lacs Band v. Minnesota*, 853 F.Supp. 1118, 1126–27 (D.Minn. 1994); *see also Muckleshoot Tribe v. Puget Sound Power & Light*, 875 F.2d 695, 697 n. 1 (9th Cir.1989); *Chase v. McMasters*, 573 F.2d 1011, 1017–18 (8th Cir.), *cert. denied*, 439 U.S. 965, 99 S.Ct. 453, 58 L.Ed.2d 423 (1978).

tion of whether the state court had jurisdiction to prosecute. 38 F.3d at 407–08. Likewise, in *White Mountain Apache* and *Tohono O'odham*, the federal courts permissibly enjoined state civil suits until they could determine whether a state court had jurisdiction to adjudicate a contract dispute that might affect interests of the tribe. *White Mountain Apache*, 856 F.2d at 1304; *Tohono O'odham*, 837 F.Supp. at 1028. These courts explained that "[t]he district court has jurisdiction to preserve the integrity of tribal claims." *White Mountain Apache*, 856 F.2d at 1304. The "federal common law of Indian affairs ... allocates jurisdiction among the federal government, the tribes, and the states," *Sycuan*, 38 F.3d at 405, and because "[s]trong federal policy encourages tribal self-government and tribal self-sufficiency, ... [c]ourts have consistently determined that the interpretation of Indian law is a matter of federal law. Accordingly, there is no bar of this action pursuant to the Anti-Injunction Statute, 28 U.S.C. § 2283." *Tohono O'odham*, 837 F.Supp. at 1028.

■ These principles are equally applicable to this case. The critical question in this case is the State Court's jurisdiction over the Nation's internal affairs. More specifically, the issues are: (a) whether, in light of the Nation's treaty protected right of self-governance, the New York courts have civil jurisdiction to adjudicate questions that relate to the Nation's internal affairs; (b) whether the New York courts are deprived of any such jurisdiction because the dispute is already being adjudicated in the courts of the Nation; and (c) whether the Nation's sovereign immunity divests the New York courts of jurisdiction to issue orders directed against the Nation's government. These issues are obviously questions of federal Indian law that directly affect tribal sovereignty and which should, therefore, be resolved in the first instance by the federal courts.

■ Third, a federal injunction is necessary to "preserve [the] judgments" of the Nation's courts. Without federal injunctive

relief the State's assumption of jurisdiction over this dispute will directly and irreparably undermine the tribal court's authority to resolve this dispute. The Anti–Injunction Act has no application where an injunction against a state court is necessary to defend a federal court's judgments from inconsistent state directives.[41] The rule has equal application to protect a tribal court's order from inconsistent state court directives. The "federal courts do have jurisdiction and authority to enjoin state court proceedings when it is necessary ... to preserve the integrity of Indian sovereignty." *Tohono O'odham*, 837 F.Supp. at 1028–29 (citing *White Mountain Apache*, 856 F.2d at 1304–06).

### 2. *Younger Abstention*

For the same reasons, the principles of federal court abstention set forth in *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) are not applicable to this case. Under *Younger*, federal courts are to abstain from adjudicating a matter only if three criteria are met: (a) state judicial proceedings must be ongoing; (b) the state proceedings must implicate an important state interest; and (c) the state proceedings must offer an adequate opportunity to litigate federal constitutional issues. *Fort Belknap*, 43 F.3d at 431; *accord Sycuan*, 38 F.3d at 408. In this case, none of the prerequisites for *Younger* abstention exist.

First, *Younger* is made inapplicable by the nature of the claims at issue in the State Court. The State Court action seeks review of legislative and executive action of the Nation, which is not subject to the *Younger* doctrine. The Supreme Court so held in *New Orleans Pub. Serv.*, 491 U.S. at 368, 109 S.Ct. at 2518, when it stated that "it has never been suggested that *Younger* requires abstention in deference to a state judicial proceeding reviewing legislative or executive action. Such a broad abstention requirement would make a mockery of the rule that only exceptional circumstances justify a federal

---

41. *United States v. Washington*, 459 F.Supp. at 1028–31 n. 3 (the federal court has power to enjoin state court judges where necessary to prevent inconsistent state court directives on Indi-

ans rights to fish under their treaties); *United States v. Michigan*, 508 F.Supp. 480, 486–87 (W.D.Mich.1980), *aff'd*, 712 F.2d 242 (6th Cir. 1983).

court's refusal to decide a case in deference to the States." *Id.*

Second, the State has no interest in the subject matter of the dispute now before the State Court. This controversy concerns exclusively matters of internal tribal government. The dispute has no affect on any interests of non-Indians or the State of New York. Because New York has no interest in the subject matter of the litigation *Younger* abstention does not apply.

The Courts of Appeal for the Ninth and Tenth Circuits have expressly rejected application of the *Younger* abstention doctrine and enjoined pending state court proceedings even where the state not only demonstrated a significant interest in the subject matter of the state suit, but also had a colorable claim of jurisdiction. *See Fort Belknap,* 43 F.3d at 431–32; *Sycuan,* 38 F.3d at 408; *Seneca–Cayuga,* 874 F.2d at 709. For example, the federal court in *Fort Belknap* enjoined state criminal prosecution of reservation Indians for failure to secure state liquor licenses. The Ninth Circuit explained that "[a]lthough the Supreme Court has already determined that states may regulate liquor transactions on Indian reservations, *see Rice v. Rehner,* 463 U.S. 713 [103 S.Ct. 3291, 77 L.Ed.2d 961] [ ] (1983), the question of a state's jurisdiction to prosecute [Indians in the state courts] is one of first impression." *Fort Belknap,* 43 F.3d at 432. The court further recognized that "[t]he state undoubtedly has an interest in enforcing its liquor laws," but that interest only arose "if federal law gives [the state] jurisdiction to do so for violations that occur on an Indian reservation." *Id.* The court found the "threshold question"—whether the state had jurisdiction to prosecute—to be "paramount and federal," making *Younger* abstention inappropriate.[42] *Id.* at 431–32.

Similarly, in *Seneca–Cayuga,* the Tenth Circuit upheld a federal court injunction against state court proceedings concerning the legality of a tribe's high-stakes bingo games even though, as the court found, the state had "undoubtedly legitimate" interests in "preventing the infiltration of organized crime, and protecting the State's economy and tax base." 874 F.2d at 711, 712. Nevertheless, the court refused to apply *Younger* abstention. The court explained that "the threshold question whether the State has authority to regulate Indian bingo is a matter of federal law" requiring consideration of whether state regulatory authority has been preempted or would infringe on tribal self-government. *Id.* at 714. Because this is

an area in which federal interests predominate, the State's interest in the litigation is in our view not important enough to warrant *Younger* abstention. Nor would resolution of these issues in state court prevent conflict between the interest of the Tribes, protected by federal law, and the interest of the State. That conflict is inevitable. Because abstention would not mitigate the conflict, the proper forum to resolve it is federal court.

*Id.* at 714;[43] *accord Sycuan,* 38 F.3d at 408; *Tohono O'odham,* 837 F.Supp. at 1028–29.

The conclusions of the Ninth and Tenth Circuits are even more compelling here. No aspect of the litigation before the State Court addresses or affects interests of the State of New York. Indeed, the State Court's assumption of jurisdiction over this dispute and its issuance of court orders that not only direct how the Nation is to govern itself, but that countermand orders issued by the Nation's own courts, strongly militate in favor of the this Court's exercise of jurisdiction and the enjoining of the State Court proceedings so that the Nation may resolve these matters in its own forums.[44]

42. On the merits, the Ninth Circuit ultimately held that under *Rice v. Rehner,* the states had jurisdiction to criminally prosecute Indians who violated the state's liquor laws. *Fort Belknap,* 43 F.3d at 432–35.

43. The court found its conclusion on the inapplicability of *Younger* enhanced by the fact that the tribe was immune from suit in the state court. 874 F.2d at 714–15. Although the tribe's sovereign immunity presented a jurisdictional bar to

the state court proceeding, the state court incorrectly refused to dismiss the action. *Id.* The same events occurred here. As stated earlier, the State Court action, although nominally against Bowen in his individual capacity, seeks relief that operates directly against the Nation.

44. *Juidice v. Vail,* 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977) is not to the contrary. That case did not present the issue of the state court's jurisdiction over the subject matter. In contrast,

### 3. The Rooker/Feldman Doctrine

Defendants-intervenors argue that, because Justice Doyle has already decided the jurisdiction issue, this Court is barred under the *Rooker/Feldman* doctrine from reviewing that decision. The Court finds, however, that the *Rooker/Feldman* doctrine has no application to this action.

 The *Rooker/Feldman* doctrine, like the *Younger* doctrine, is a judicially-created doctrine of abstention based on principles of comity. *Rooker/Feldman*, however, is concerned with the impact of a federal action on a *final* state court judgment, *see Johnson v. De Grandy*, —— U.S. ——, ——, 114 S.Ct. 2647, 2654, 129 L.Ed.2d 775 (1994) (*Rooker/Feldman* is an "abstention doctrine, under which a party losing in state court is barred from seeking what in substance would be appellate review of the state judgment in a United States District Court"), while *Younger*, in contrast, deals with the impact of federal litigation on an *on-going* state proceeding.

The United States Supreme Court has applied the *Rooker/Feldman* doctrine only in the context of final state judgments. *Rooker* itself concerned a collateral attack on a final state judgment which had been appealed through the state appellate courts. *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 414–15, 44 S.Ct. 149, 149–50, 68 L.Ed. 362 (1923). Likewise, in *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983), the Supreme Court considered the propriety of a federal district court suit in which some of the claims questioned the validity of a final judgment of the District of Columbia Court of Appeals

denying an attorney's application for admission to the bar. In contrast to *Feldman*, when an attorney initiated a federal suit to challenge the constitutionality of pending state disciplinary proceedings against him, the Supreme Court assessed the federal suit under the principles of *Younger* abstention—considering the state's interest in the on-going action and the adequacy of opportunities in the state proceeding to address the federal questions. *Middlesex County Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 431–32, 102 S.Ct. 2515, 2520–21, 73 L.Ed.2d 116 (1982). The distinction illustrated by comparison of *Middlesex* with *Feldman*, controls here.[45] This case affects a pending state court proceeding—the very continuation of which, in and of itself, directly and impermissibly interferes with an Indian tribe's treaty-protected rights of self-government and sovereignty. This Court's authority to proceed with this suit does not implicate any state interest in a state court's final judgment as protected by *Rooker/Feldman*.

 The *Rooker/Feldman* doctrine is not, as defendants-intervenors contend, a broad rule that deprives federal courts of jurisdiction whenever a state court has issued any order in a pending suit. To the contrary, as evidenced by the *Rooker* and *Feldman* decisions themselves, they only preclude federal district court jurisdiction where the suit is in fact a collateral attack on a final state court judgment. As the Court explained in *Feldman*, the doctrine does not preclude federal courts from assuming jurisdiction over federal constitutional challenges

---

the threshold question at issue here is whether federal law bars the State Court from exercising jurisdiction over the controversy. If so, then there is no authority for the State Court to proceed in the case. As established by the Ninth and Tenth Circuits in *Fort Belknap* and *Seneca–Cayuga*, this is a question of federal Indian law which must be resolved in the federal courts first. A decision on this issue does not touch or offend the State's contempt process because the State's interest in enforcing the orders of its courts is predicated on its having jurisdiction. Moreover, here, unlike *Juidice*, there has been no contempt proceeding (other than a issuance of the Show Cause Order), much less any finding of contempt.

**45.** The Second Circuit's decision in *Tang v. Appellate Div. of New York Supreme Court*, 487 F.2d 138, 140 (2d Cir.1973), *cert. denied*, 416 U.S. 906, 94 S.Ct. 1611, 40 L.Ed.2d 111 (1974), is consistent with this. Like the bar applicant in *Feldman*, Tang filed a federal suit challenging a decision denying him admission to the New York bar after the Appellate Division of the New York State Supreme Court had issued a final judgment on the merits of the claim, including a ruling on the constitutional issue that he sought to raise in the subsequent federal court suit.

which do not require review of a final state court judgment. 460 U.S. at 486, 103 S.Ct. at 1316. The test is whether the constitutional claims are "inextricably intertwined" with the state court's action which would in effect require the federal court to review the state court decision. *Id.* *Rooker/Feldman* has not been applied by the Supreme Court to matters on which the federal courts have exclusive or primary jurisdiction—as occurs in the context of questions of federal Indian law.

█ Further, the Second Circuit held in *Texaco Inc. v. Pennzoil Co.,* 784 F.2d 1133, 1143–44 (2d Cir.1986), *rev'd on other grounds,* 481 U.S. 1, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987), that *Rooker/Feldman* is inapplicable where the federal claims have not been presented in or addressed by the state court proceeding. *Id.* at 1144. That exception applies here. The State Court was not presented with, nor did it purport to address the merits of Bowen's claim that an assumption of State Court jurisdiction over a political controversy concerning essential aspects of tribal government is precluded by the Nation's treaty-protected right of self-governance. Thus, the State Court's preliminary decision to proceed with the State Court action cannot, under the circumstances present here, be considered to be a judgment on the merits of Bowen's federal treaty rights claim.

█ Finally, *Younger* and *Rooker/Feldman* are no bar because Bowen's claims in this action—that the treaty-protected right of self-governance, the tribal court exhaustion doctrine, and tribal sovereign immunity bar the State Court action—cannot be vindicated if the State Court is allowed to proceed. A claim of sovereign immunity is forever lost by subjecting Bowen to the very process from which he asserts he is immune. *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.,* — U.S. —, —, 113 S.Ct. 684, 687, 121 L.Ed.2d 605 (1993). The same is true of Bowen's self-governance and tribal court exhaustion claims. If the State Court is permitted to proceed and to decide matters and issue orders affecting the internal affairs of the Nation, it is no answer for another court to later say that this was in error. Appellate review in the state court system offers Bowen no relief because it is the very continuation of the state proceedings that will destroy the object of his claims in this Court—the preservation of the Nation's sovereignty and the viability of the Nation's courts.

### 4. *United States ex rel. Kennedy v. Tyler*

The State Defendants and the defendants-intervenors argue that the Supreme Court's decision in *United States ex rel. Kennedy v. Tyler,* 269 U.S. 13, 46 S.Ct. 1, 70 L.Ed. 138 (1925), prevents this action from going forward, and that plaintiffs' only recourse is to litigate the State Court action to conclusion in the State Courts, with possible review by the United States Supreme Court. The Court finds this argument without merit.

█ First, *Tyler* was an action for a writ of *habeas corpus,* not a suit brought under 42 U.S.C. § 1983. The rule it applied, that a *habeas* petitioner is required to exhaust state remedies prior to seeking relief in federal court, had been "firmly established by repeated decisions of [the Supreme Court]" prior to that time. *Id.* at 17, 46 S.Ct. at 3. The Court in *Tyler* simply applied that rule. Since *Tyler,* the federal courts have continued to require exhaustion in *habeas* cases. *See, e.g., Castille v. Peoples,* 489 U.S. 346, 349, 109 S.Ct. 1056, 1059, 103 L.Ed.2d 380 (1989); *Murray v. Carrier,* 477 U.S. 478, 488–89, 106 S.Ct. 2639, 2645–46, 91 L.Ed.2d 397 (1986); *Duckworth v. Serrano,* 454 U.S. 1, 3, 102 S.Ct. 18, 19, 70 L.Ed.2d 1 (1981). Simply put, *Tyler* is a *habeas corpus* exhaustion case.

This action, however, is an action for declaratory and injunctive relief brought under § 1983, not an action for a writ of *habeas corpus.* While *Tyler* continues to state the law with regard to *habeas* actions, that rule has no application here. In contrast to the exhaustion of state remedies required for *habeas corpus,* exhaustion is not required for an action under § 1983. *See Wright v. City of Roanoke Redevelopment & Hous. Auth.,* 479 U.S. 418, 427–28, 107 S.Ct. 766, 772–73, 93 L.Ed.2d 781 (1987); *Patsy v. Florida Board of Regents,* 457 U.S. 496, 516, 102

S.Ct. 2557, 2568, 73 L.Ed.2d 172 (1982). The Supreme Court recently emphasized this distinction between *habeas corpus* and § 1983 claims, stating:

> Both of these [*habeas corpus* and § 1983 statutes] provide access to a federal forum for claims of unconstitutional treatment at the hands of state officials, but they differ in their scope and operation. In general, exhaustion of state remedies is not a prerequisite to an action under § 1983, even an action by a state prisoner. The federal habeas corpus statute, by contrast, requires that state prisoners first seek redress in a state forum.

*Heck v. Humphrey*, —— U.S. ——, ——, 114 S.Ct. 2364, 2369, 129 L.Ed.2d 383 (1994) (footnote and citations omitted). Thus, Bowen is not required by *Tyler* to exhaust his state remedies before bringing this § 1983 action.

Second, *Tyler* actually supports the granting of an injunction in this case. In *Tyler*, the Supreme Court required that remedies be exhausted in the court in which the action was first filed. *Tyler*, 269 U.S. at 17–18, 46 S.Ct. at 2–3. In *Tyler*, that court was the state court. *Id.* In this instance, suit was filed first in the Peacemakers Court. Thus, *Tyler* would, if it had any application here, require that tribal—not state—remedies be exhausted. Indeed, this result is consonant with the Supreme Court's decisions in *La-Plante* and *National Farmers Union*.

Finally, the law regarding the relationship between the State of New York and the Nation has significantly changed since *Tyler*. The question of the extent of the State's authority over Indian affairs, which the Court expressly left undecided in *Tyler*, has since been resolved. While the Court in *Tyler* noted that the State of New York had long asserted authority over Indian tribes within the State, 269 U.S. at 17, 46 S.Ct. at 2, the legality of that position was rejected by the Second Circuit in *United States v. Forness*, 125 F.2d 928 (2d Cir.), *cert. denied sub nom. City of Salamanca v. United States*, 316 U.S. 694, 62 S.Ct. 1293, 86 L.Ed. 1764 (1942). The Second Circuit held in *Forness* that, "state law does not apply to the Indians except so far as the United States has given its consent." *Id.* at 932. The holding of *Forness* was affirmed by the United States Supreme Court in *Oneida Indian Nation*, 414 U.S. at 671–72, 94 S.Ct. at 779–80.[46]

### F. Neither this Action nor the State Court Action is Moot.

Defendants-intervenors claim that both this action and the State Court action are now moot because, on January 28, 1995, Bowen was impeached as President of the Nation. Bowen argues that he was not impeached. On February 6, 1995, the Peacemakers Court held that the impeachment proceedings against Bowen were invalid under the Constitution. *See Scanlan, et al. v. Printup, et al.*, Civil Action No. 0127–95 (Seneca Nation of Indians Peacemakers Court). Defendants-intervenors argue that Bowen's impeachment is not subject to judicial review by any court. The Court finds that the question of whether or not Bowen has been impeached is in dispute and is directly related to the claims asserted in this

---

46. *New York v. Anderson*, 671 F.Supp. 220 (W.D.N.Y.1987) does not support the position of the State Defendants and the defendant-intervenors that this case should be resolved by the State Courts. In *Anderson*, the court was asked to determine whether a suit filed by the Attorney General of New York, at the request of the tribe, against a member of the Tuscarora Nation for conducting a bingo operation in violation of Tuscarora law, could be removed to federal court. The court emphasized that the party removing the case has the burden to establish that the federal court has original jurisdiction, and "the general rule is that the federal question must appear in the complaint well pleaded, unaided by the answer or the petition for removal." *Id.* at 222. The court held that the original complaint was not sufficiently based on a federal question to permit removal and that the fact that the Tuscarora Chiefs had already outlawed the defendant's bingo operation and requested that the State take action in the case rendered the court's jurisdiction "doubtful." *Id.* at 224. In so ruling, the court emphasized that the dispute did "not involve a conflict between State and Tuscarora law," and the relief sought was "in no way incompatible with tribal interest." *Id.* This case is distinguishable because here, unlike *Anderson*: (a) the State Court action was initiated after the dispute was the subject of a proceeding in a tribal court; and (b) there is, in fact, a conflict between tribal and State law in the form of contrary court orders issued by the Peacemakers Court and by the State Court.

action.[47] Accordingly, neither this action nor the State Court action is moot.

## IV. *Sufficiently Serious Questions Going to the Merits and a Balance of Hardships Tipping Decidedly Toward the Party Seeking Injunctive Relief*[48].

 Based on the discussion above, the Court finds that, even if Bowen cannot show a likelihood of success on the merits, there are sufficiently serious questions going to the merits of Bowen's claims so that injunctive relief is appropriate. Further, the Court finds that the balance of hardships tips decidedly in Bowen's favor. As discussed in more detail in the following section, Bowen, in both his individual capacity and in his capacity as President of the Nation, will suffer immediate and irreparable harm unless the State Defendants are enjoined from continuing to exercise jurisdiction over this internal dispute. On the other side of the scale, the State Defendants will not be harmed by the granting of a preliminary injunction because, as stated earlier, they have no interest in the outcome of the underlying dispute. If it is ultimately determined that this Court erred in granting the preliminary injunction, then the State Court action will simply proceed as usual and the State Defendants will not be harmed. Nor will the defendants-intervenors be harmed because they will still be free to litigate their claims in the Peacemakers Court.

## V. *Irreparable Harm*

The Court finds that Bowen will suffer immediate and irreparable harm if the State Defendants are not enjoined from continuing to exercise jurisdiction over this wholly internal tribal dispute. As President of the Nation, vested under the Nation's Constitution with the executive power of the Nation and the responsibility to see that the laws applicable to the Nation are faithfully executed, Bowen has both the right and obligation to protect the Nation's treaty-protected rights to self-government and exclusive jurisdiction over its internal affairs.

 Treaty rights, including the Nation's right of self-government, are protected by the Supremacy Clause of the United States Constitution, as the federal courts have repeatedly held. *See, e.g. Antoine*, 420 U.S. at 206, 95 S.Ct. at 951; *United States v. 43 Gallons of Whiskey*, 93 U.S. 188, 23 L.Ed. 846 (1876); *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 8 L.Ed. 483 (1831); *United States v. Michigan*, 471 F.Supp. 192, 265 (W.D.Mich.1979). The deprivation of constitutional rights that cannot be repaired by an award of damages constitutes irreparable injury. *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1026 (2d Cir.1985); *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir.1984). "Where denial of fundamental interests such as constitutional rights are involved, damage may be presumed to be irreparable and an injunction should issue as a matter of course." *United States v. Michigan*, 508 F.Supp. 480, 492 (W.D.Mich.1980); *see also United States v. Michigan*, 534 F.Supp. 668, 669 (W.D.Mich.1982).

As discussed earlier, the State Court's Orders in this instance clearly violate the Nation's treaty-protected rights of self-governance and exclusive authority over internal tribal affairs. These Orders and the threatened contempt proceedings force Bowen to either acquiesce in the usurpation of the Nation's treaty-protected rights pursuant to the State Court's Orders and ignore the Orders of the Nation's Peacemakers Court, or face physical restraint, arrest and possible imprisonment for exercising these rights and complying with and enforcing the Orders of

---

**47.** Because, under the Nation's Constitution, the impeachment court is composed of, among others, members of the Council, and the issue of who may sit on the Council is at the core of this dispute, issues concerning the validity of the alleged impeachment are directly related to the outcome of this litigation.

**48.** The Court notes that, because Bowen is seeking to enjoin actions of the State Defendants which are arguably being taken in the public interest pursuant to a federal statute, he might be required to meet the likelihood-of-success-on-the-merits standard rather than the less rigorous sufficiently-serious-questions standard. *See Able v. United States*, 44 F.3d 128, 130–131 (2d Cir. 1995); *Union Carbide Agr. Prod. Co. v. Costle*, 632 F.2d 1014, 1018 (2d Cir.1980). The parties have not raised this issue so the Court will not address it.

the Peacemakers Court. The injury that would unavoidably result from this Hobson's choice is irreparable and cannot be compensated by money damages. Indeed, the threat of arrest resulting from Bowen's compliance with and enforcement of the Orders of the Peacemakers Court is itself sufficient to establish irreparable harm. *See United States v. Michigan*, 508 F.Supp. at 492.

Furthermore, the continued exercise of jurisdiction by the State Defendants over this dispute will, unless restrained, usurp the power of the judicial branch of the Nation to resolve internal tribal disputes. By either ignoring or denying effect to the Orders of the Nation's Courts, the State Defendants' actions have literally rendered the Nation's courts irrelevant to the resolution of this dispute. This disregard of the right of the Nation's Courts to interpret Nation law on fundamental questions arising under the Constitution, customs, and laws of the Nation, renders the Nation's "power to make their own substantive law in internal matters and to enforce that law in their own forums" a virtual nullity. *Santa Clara Pueblo*, 436 U.S. at 55–56, 98 S.Ct. at 1675–1676 (citations omitted); *Wheeler*, 435 U.S. at 322, 98 S.Ct. at 1085; *LaPlante*, 480 U.S. at 18, 107 S.Ct. at 977. The usurpation of this authority is irreparable and cannot be compensated for in money damages.

Indeed, if the State Court were allowed, in this instance, to continue to exercise jurisdiction over such a clearly political and internal dispute and to ignore and even countermand all prior Orders of the Peacemakers Court, where the dispute was first presented, it would be virtually certain that all future internal tribal disputes would end up in the State Court rather than the Peacemakers Court; they would be either brought in the State Court initially or "appealed" to the State Court by the losing party in the Peacemakers Court. Such a result would not only destroy the authority of the Nation's judiciary, but would undermine the Nation's very existence as a sovereign entity.

Appellate review through the State Courts, with possible review by the United States Supreme Court, does not eliminate the irreparable harm. As stated earlier, it is the very continuation of the State Court proceedings that would cause the harm—the deprivation of the Nation's treaty-protected rights to self government and exclusive jurisdiction over its internal affairs. Moreover, during what could be a lengthy appeal process, the Nation's government, as constituted pursuant to the State Court's Orders, would, by necessity, continue to act and make decisions affecting the Nation. Even if it were determined at sometime in the future that the State Court erred in exercising jurisdiction, the actions taken and decisions made by the State Court-appointed government in the interim would, by that time, be irreversible.

## VI. *The Public Interest*

██ The Court finds that, in this instance, the public's interest and the interests of the Nation and its members coincide and would best be served by this Court enjoining the State Court action. As the cases cited above amply demonstrate, there is a strong federal policy favoring tribal self-government, tribal self-sufficiency and deference to tribal court jurisdiction. The Nation, like other Indian tribes, has a long history of struggling in the federal and state courts to maintain its sovereign identity. State Court jurisdiction over the type of internal dispute present here would set a dangerous precedent that could severely undermine the Nation's sovereignty, usurp the authority of the Nation's courts, and erode the power of the Nation's leaders to govern for generations to come.

Defendants-intervenors argue that Bowen, through his allegedly unconstitutional actions, has created a constitutional crisis of such dimension that it can only be resolved by intervention of the State Court. The Nation, however, is a democratic society and must solve such political disputes through the democratic process. The United States, as a nation, has, in the past, faced similar constitutional crises created by conflicts between the different branches of the federal government, but has always been able to overcome those crises and move forward without harm to the Constitution, disintegration of the government, or outside interference. The Court is confident that the Nation will similarly be

able to overcome this crisis, but it must do so by itself, through the democratic process, without outside interference. State Court intervention in this crisis may perhaps resolve the crisis in the short term, but such intervention could have a devastating long-term affect on the Nation's ability to govern itself, to make its own laws, and to resolve its own internal problems.

The State Defendant and the defendants-intervenors argue that State Court intervention was necessary in this instance because there was unrest and a potential for violence on the reservation if the dispute was not resolved quickly. The defendants-intervenors alleged before Justice Doyle that Bowen and/or his supporters had physically seized and occupied one of the Nation's administration buildings and physically intimidated employees of the Nation's government.[49] Defendants-intervenors state in their memorandum in opposition that, "[r]ecognizing the volatile situation created by Bowen's lawless disregard for Seneca law, Justice Doyle asserted jurisdiction...." [50]

 The Court can certainly understand and empathize with any concerns that Justice Doyle might have had regarding these allegations of unrest and potential violence, and recognizes why Justice Doyle, when confronted with such a situation and having a short time to react, opted to exercise jurisdiction. Nevertheless, although allegations of potential violence and unrest are obviously serious, they cannot serve as a basis for the State Court to exercise jurisdiction over a civil action involving an internal tribal dispute. As stated above, when it comes to Indian affairs on the reservation, state courts are courts of limited jurisdiction and can only act pursuant to Act of Congress, and there is no such Act that would allow the State Court to exercise jurisdiction in this instance. Of course, if violence does occur, the State of New York would have jurisdiction over any criminal offenses, pursuant 25 U.S.C. § 232.[51]

**CONCLUSION**

Accordingly, in order to prevent infringement of the Nation's treaty rights to self-government and exclusive authority over its internal affairs, to preserve the authority of the Nation's courts, and to protect the Nation's sovereignty, the Court grants plaintiff Dennis J. Bowen, Sr.'s motion for a preliminary injunction pursuant to Fed.R.Civ.P. 65(a), and it is hereby

**ORDERED** that Justices Doyle and Wolfgang and the courts of the State of New York are enjoined and restrained in any manner and by any means from proceeding in, and/or exercising any further jurisdiction over the parties and subject matter of, the case presently pending in New York Supreme Court captioned *Ross L. John, Sr. et al. v. Dennis J. Bowen,* Index No. 1994/12582 pending further order of this Court, and it is further

**ORDERED** that Justices Doyle and Wolfgang and the courts of the State of New York are enjoined and restrained in any manner and by any means from proceeding in or conducting any contempt proceeding regarding Dennis J. Bowen, Sr. in the case of *Ross L. John, Sr., et al. v. Dennis J. Bowen,* Index No. 1994/12582 until further order of this Court, and it is further

**ORDERED** that Justices Doyle and Wolfgang and the courts of the State of New York are enjoined and restrained in any manner and by any means from enforcing or causing to be enforced any and all Orders previously issued in the case of *Ross L. John, Sr. et al. v. Dennis J. Bowen,* Index No. 1994/12582, and it is further

**ORDERED** that plaintiff Dennis J. Bowen, Sr. shall be required to post a $1000 security bond, pursuant to Fed.R.Civ.P. 65(c), by 5:00 p.m. March 3, 1995, and it is further

49. The Court takes no position as to the truth or falsity of these allegations.

50. The Court notes that there is no mention of a "volatile situation," unrest or the potential for violence in Justice Doyle's December 22 Decision.

51. It is the Court's intention that nothing contained in this Decision and Order shall supersede or diminish the obligation of local and state law enforcement authorities to fulfill their duties and responsibilities in enforcing state laws and local ordinances.

**ORDERED** that counsel for all parties are to appear in this Court at 9:00 a.m. March 14, 1995 for a status/scheduling conference.

IT IS SO ORDERED.